**UNITED STATES of America, Plaintiff,**

v.

**NEW ORLEANS PUBLIC SERVICE, INC., Defendant.**

Civ. A. No. 73–1297.

United States District Court, E.D. Louisiana.

Sept. 10, 1982.

a private, implied cause of action to enforce the provisions of § 2, third and fourth, of the RLA, 45 U.S.C. § 152, third and fourth.

Richard Ugelow, Washington, D.C., for plaintiff.

Michael J. Molony, Jr., Gerald J. Huffman, Jr., New Orleans, La., for defendant.

CASSIBRY, District Judge:

## I.

### PROCEDURAL STATUS AND QUESTION PRESENTED

The Attorney General brought this action on May 17, 1973 on behalf of the United States to require defendant, New Orleans Public Service, Inc. ("NOPSI"), to comply with Executive Order 11246, as amended, and the regulations of the Secretary of Labor which were promulgated pursuant to

this executive order, 41 C.F.R. §§ 60–1.1 through 60–741.54 (1978). More specifically, the United States sought an injunction to obtain access to NOPSI's records to determine whether NOPSI had complied with the mandates of Executive Order 11246. That order prohibits employment discrimination and imposes on government contractors such as NOPSI the obligation to take affirmative action to achieve the equal opportunity goals of the executive order's mandate.[1] This court entered a decision adverse to NOPSI and permanently enjoined the utility from failing or refusing to: 1) comply with the executive order; 2) implement regulations; and 3) allow the government to conduct compliance reviews of NOPSI. *United States v. New Orleans Public Service, Inc.*, No. 73–1297 (E.D.La. 1974).

NOPSI appealed, questioning, *inter alia,*[2] whether the executive order and relevant regulations were constitutional, whether the mandates of the executive order could be imposed on the utility without its contractual consent, and whether, and to what extent, the Fourth Amendment protected the utility's records from governmental view. *United States v. New Orleans Public Service, Inc.*, 553 F.2d 459 (5th Cir.1977). The Fifth Circuit held that the executive order and the regulations were authorized by Congress and, therefore, could validly be applied to NOPSI. The Fifth Circuit also rejected NOPSI's arguments that the executive order and its regulations violated the Fourth Amendment because they authorized warrantless searches of NOPSI records, but the Fifth Circuit withheld the injunctive relief granted by this court. Instead, the Fifth Circuit allowed NOPSI to comply

voluntarily, and authorized the government to seek, through administrative proceedings, resolution of any remaining issues concerning access to NOPSI's records.

The United States Supreme Court, 436 U.S. 942, 98 S.Ct. 2841, 56 L.Ed.2d 783 (1978), vacated the Fifth Circuit decision for reconsideration in light of *Marshall v. Barlow's Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), a decision subsequent to the Fifth Circuit opinion, which dealt with administrative inspection of business records. Accordingly, the Fifth Circuit remanded the case to this court for reconsideration in light of *Barlow's. United States v. New Orleans Public Service, Inc.,* 577 F.2d 1030 (5th Cir.1978). Because this court concluded that the *Barlow's* opinion did not dictate a reversal of its earlier ruling,[3] an order was entered that was similar to the order issued by the Fifth Circuit prior to the Supreme Court's review: this court authorized the government to proceed through administrative action to force NOPSI to comply with the executive order and the regulations. An injunction to this effect was not issued, however. Instead, this court relied on the declaratory force of its decisions, and on the good faith of the parties. *United States v. New Orleans Public Service, Inc.,* 480 F.Supp. 705 (E.D.La.1979).

An appeal was again taken, and the Fifth Circuit vacated and remanded, *United States v. Mississippi Power & Light Co.,* 638 F.2d 899 (5th Cir.1981).[4] On remand, the question presented is whether the manner in which the government chose to initiate the search of NOPSI records satisfies Fourth Amendment standards of "reasonableness". Therefore, this court must exam-

---

1. Generally, the goals seek to increase the hiring of members of racial and ethnic minorities. The history of Executive Order 11246 is described in detail in *United States v. New Orleans Public Service, Inc.,* 553 F.2d 459 (5th Cir. 1977).

2. All of the grounds on which NOPSI challenged the government inspection are detailed extensively at 553 F.2d 459.

3. *United States v. New Orleans Public Service, Inc.,* C.A. No. 73–1297 (E.D.La.1974).

4. At approximately the same time that this suit was filed in the Eastern District of Louisiana, an action was also brought in the Southern District of Mississippi to compel compliance by the Mississippi Power & Light Company with Executive Order 11246. In its most recent review, 638 F.2d 899, the Fifth Circuit considered together both the suit filed in Louisiana and the suit filed in Mississippi, thus explaining the change in the reported case name of the suit.

ine the government's decision to initiate the NOPSI review in light of the Fourth Amendment. The proposed "search" of NOPSI records is reasonable if it was based on either: 1) specific evidence of an existing violation; or 2) a showing that reasonable legislative or administrative standards for conducting an inspection are satisfied with respect to a particular establishment; or 3) a showing that the search is pursuant to an administrative plan containing specific neutral criteria. *United States v. Mississippi Power & Light Co.,* 638 F.2d 899, 907 (5th Cir.1981).

An evidentiary hearing was held on this matter and, for the reasons discussed below, I find that the method by which the United States chose to initiate the NOPSI review passes muster under the Fourth Amendment test of reasonableness. Therefore, as directed by the appellate court,[5] the injunction requested by the United States shall issue immediately, ordering NOPSI to submit to a compliance review.

## II.

## FINDINGS OF FACT

### 1.

NOPSI is a privately owned Louisiana corporation and public utility engaged in the production, distribution and sale of electrical power to consumers and governmental agencies located in New Orleans, Louisiana on the east bank of the Mississippi River. NOPSI is also engaged in the sale and distribution of natural gas to users throughout New Orleans.

### 2.

Prior to June 30, 1970, NOPSI had a written contract with the National Aeronautics and Space Administration ("NASA"), containing a non-discrimination clause. Although this written contract expired, NOPSI nevertheless continued to supply gas and electric service to NASA.

*Responsibilities of the Office of Federal Contract Compliance and the General Services Administration Under Executive Order 11246*

### 3.

Executive Order 11246 prohibits discrimination in employment by federal contractors based on race, sex, color, religion, or national origin, and requires such contractors to take affirmative action, *inter alia,* to ensure that employees and applicants for employment are afforded equal hiring, transfer, and promotional opportunities.

### 4.

Section 210 of Executive Order 11246 empowers the Secretary of Labor to "adopt such rules and regulations and issue such orders as he deems necessary and appropriate to achieve the purpose" of the executive order. Pursuant to that authority, the Secretary of Labor promulgated the regulations implementing Executive Order 11246, which were codified at 41 C.F.R. 60–1 *et seq.*

### 5.

At all times relevant to this lawsuit, in 41 C.F.R. 60–1.2, the Secretary of Labor delegated his authority and responsibility for enforcing the executive order (except the authority to issue rules and regulations of a general nature), to the Director of the Office of Federal Contract Compliance ("OFCC").

### 6.

On October 24, 1969, the Director of OFCC issued Order No. 1, which designated various federal agencies as contract compliance agencies with responsibilities for specific industries. The General Services Administration ("GSA") was delegated contract compliance responsibility for fifteen industries, including the utilities industry.[6]

---

**5.** "If the district court finds that the requested [search satisfies] the Fourth Amendment standards of reasonableness, outlined above, there will be no further objections that NOPSI ... can raise, and the district court should immedi-

ately issue the injunction requested by the United States." 638 F.2d at 908.

**6.** By Executive Order 12086, dated October 5, 1978, President Carter removed all contract compliance functions from the contract compliance agencies and consolidated them in the

**7.**

OFCC conducted studies, furnished information, and issued memoranda to assist contract compliance agencies such as GSA in utilizing their limited resources in the most effective manner. The following are among the documents and memoranda issued by OFCC:

(a) Memorandum from John Wilks dated September 24, 1970—Contract Compliance Program Guidance Memorandum;

(b) Memorandum from John Wilks dated September 9, 1971—Contract Compliance Program Guidance Memorandum; and

(c) The OFCC Target Selection System.

These memoranda and documents established policies, procedures, and guidelines for contract compliance agencies to utilize in enforcing their contract compliance responsibilities. Contract compliance agencies were directed to utilize, *inter alia,* the following information in scheduling compliance reviews:

(a) EEO–1 forms [7] filed by government contractors with the joint reporting committee, which show minority and female employment;

(b) OFCC's Management Information System which shows the hiring and promotional opportunities of government contractors; and

(c) The McKersie System which compares EEO–1 information with census data to identify those industries and facilities within industries which indicate the greatest employment and promotional opportunities for minorities and females.

**8.**

The OFCC memoranda also identified certain industries for priority compliance activity. Included among such industries were electric, gas, and sanitary services— "utilities industries". The memoranda also advised compliance agencies of the number of reviews and target opportunities planned for the agency by OFCC.

**9.**

In 1970, OFCC scheduled GSA for the following industrial reviews:

| | Preaward Reviews | Postaward Reviews (Routinely Scheduled) |
|---|---|---|
| Fiscal Year 1971 | 151 | 971 |
| Fiscal Year 1972 | 151 | 2,537 |

In fiscal year 1971, GSA actually conducted a total of 951 nonconstruction preaward, routine and complaint compliance reviews. In fiscal year 1972, GSA actually conducted a total of 1,905 nonconstruction preaward, routine and complaint compliance reviews.

**10.**

In fiscal years 1971 and 1972 GSA was scheduled to conduct 715 compliance reviews of federal contractors in the utilities industry. These reviews were to provide 28,125 minority recruitment opportunities.

*The Criteria Used in Identifying Federal Contractors Within the Utility Industry For Postaward Compliance Reviews*

**11.**

In October, 1970, Edward E. Mitchell, then Deputy Assistant Administrator for Administration at GSA, was given responsibility for studying and reorganizing GSA's contract compliance program in view of the new responsibilities assigned to GSA by Order No. 1. As part of the study, GSA identified some 24,000 major government contractors within the industries assigned to it by Order No. 1. These contractors were identified through a review of EEO–1 reports, Dunn and Bradstreet data, and oth-

---

Department of Labor. 43 Fed.Reg. 46501. Implementing regulations were adopted by the Secretary of Labor on October 20, 1978. 43 Fed.Reg. 49240. Although Order No. 1, issued by the Director of OFCC was revoked by the consolidation, the Order was in effect during the period of the proposed compliance reviews at issue in this case.

**7.** The EEO–1 report is the standard document on which employers subject to Title VII of the Civil Rights Act of 1964 and/or Executive Order 11246 identify the racial and sexual composition of their work force by job group and earnings.

er information relating to corporate size and volume of business. The EEO-1 forms indicated whether the corporation held government contracts in excess of $10,000 and also revealed the distribution of employees by race and sex within various job categories.

12.

As part of its review of the industries assigned to it by Order No. 1, GSA selected the utilities, paper, and communications industries for priority compliance review activity because they were industries in which minorities and females were substantially underrepresented and they were growth industries which afforded increased employment opportunities. GSA's selection of the utilities industry was based on, among other things: analyses of consolidated EEO-1 data; EEOC studies on the utilization of minorities and women in the industry; computer data generated by Professor Robert McKersie, former dean of the Cornell University School of Industrial and Labor Relations, reflecting the representation of minorities and women in the utilities industry in comparison with their availability in the general labor force; newspaper articles and other publications dealing with the problems faced by minorities and women in gaining access to and promotions in the utilities industry; the lack of prior compliance reviews of federal contractors within the industry; and the security and growth potential of jobs within the industry.

13.

The following are among the studies and publications relating to the equal employment practices of the utilities industry which were reviewed and considered by Mr. Mitchell:

(a) Negro Employment in Public Utilities—A Study of Racial Policies in the Electric Power, Gas and Telephone Industries, by Bernard E. Anderson, 1970, University of Pennsylvania; and

(b) "Employment Patterns in the Utilities Company, 1966–67."

14.

Commencing in October, 1970, at Mr. Mitchell's recommendation, GSA selected individuals within its ten regional offices to be assigned to conduct contract compliance reviews. Individuals were selected based upon their background and experience and they were required to attend training sessions in which they received instruction both in the procedures for targeting government contractors for compliance reviews and the method and procedures to be followed in conducting those reviews.

15.

Among the factors the GSA compliance personnel were instructed to consider in scheduling routine contractor facilities postaward reviews were:

(a) whether the industry was a growth industry;

(b) whether the company was a growth company, i.e., whether there were employment opportunities;

(c) whether the contractor's EEO-1 reports revealed a poor minority or female employment profile;

(d) whether a comparison of the contractor's EEO-1 data as compared to census data revealed underrepresentation of minorities or females;

(e) whether there were complaints of employment discrimination filed against the contractor with appropriate agencies, including the Equal Employment Opportunity Commission ("EEOC");

(f) whether the industry had been selected for priority review; and

(g) whether the contractor was perceived in the community as an unfair employer.

17.

The evidence presented by the United States in this case relates to two separate and distinct attempts by GSA to review NOPSI's compliance with Executive Order 11246 and its implementing regulations.

The first notice to NOPSI of GSA's plans to review NOPSI records was contained in a letter dated March 15, 1971. This was to be

a routine or postaward compliance review. The second notice of intent to review NOPSI's records was dated March 15, 1972. This review was attempted pursuant to 41 C.F.R. 60–1.20(d), which mandates that before a federal agency can execute a contract of $1 million or more, the prospective contractor's ability to fulfill his obligations under Executive Order 11246 must be determined. This kind of review is known as a preaward review.

18.

The standards developed by the government and utilized by Mr. Mitchell for scheduling federal contractors within the utility industry for compliance reviews were reasonable.

19.

The government developed and implemented an administrative plan containing specific neutral criteria for scheduling federal contractors within the utility industry for compliance reviews.

*Criteria Used In Scheduling NOPSI For The 1971 Postaward Compliance Review*

20.

Kenneth C. Patton was selected as a Senior Assistant Contract Compliance Officer in GSA Region 7—the Southwestern Region. Mr. Patton held that position from approximately November 1, 1970, until approximately April 1, 1975. GSA Region 7 was headquartered in Fort Worth, Texas, and covered the states of Louisiana, New Mexico, Texas, Oklahoma, and Arkansas.

By letter dated March 15, 1971, Mr. Patton notified NOPSI that the records of the federal government indicated that NOPSI was a government contractor subject to Executive Order 11246 and the rules and regulations pertaining thereto, and that GSA had been assigned responsibility for determining the extent to which NOPSI was in compliance with Executive Order 11246. The letter also advised NOPSI that GSA proposed to visit NOPSI's facilities on April 27 and 28, 1971, for the purpose of conducting a review of its equal employment opportunity policies and practices. This letter

also requested NOPSI to have employment statistics available and, as applicable, seniority rosters, collective bargaining agreements, employment test validation procedures, and affirmative action plans. This information was typical of the information GSA sought from other government contractors and it was Mr. Patton's experience that contractors generally maintained the type of data sought from NOPSI.

21.

It was Mr. Patton's practice, in conjunction with the scheduling of compliance reviews, to:

(a) determine that the contractor was in an industry which had been assigned to GSA by Order No. 1;

(b) review the contractor's most recent EEO–1 reports;

(c) determine the available minority representation in the employer's labor market from the relevant census data and compare it to the employer's EEO–1 reports;

(d) compare the contractor's representation of minorities and females with the representation of other companies in the industry;

(e) determine whether the contractor had been previously reviewed, and, if so, when. The purpose of this procedure was to ensure that companies were scheduled for review who either had not been reviewed or had been reviewed several years in the past;

(f) consult with the EEOC to determine the number and nature of outstanding complaints; and

(g) determine if other contractors within the geographic area had been reviewed. This was done so as not to concentrate compliance reviews in any one geographic area.

22.

The census data reviewed by GSA was that for the Orleans Parish and the New Orleans standard metropolitan statistical area ("SMSA"). The data available to GSA in conjunction with scheduling NOPSI for a

review in 1971 would have been either the 1960 or 1970 census data. The EEO–1 reports which would have been reviewed by GSA in conjunction with scheduling NOPSI for a review in 1971 would have been either the 1969 or 1970 EEO–1 reports filed by NOPSI.

23.

A comparison of NOPSI's consolidated EEO–1 reports with the experienced civilian labor force for the New Orleans SMSA shows an underrepresentation of minorities in several employee positions or categories at NOPSI.[8]

24.

As of March, 1971, several claims of discrimination had been filed with the United States EEOC charging NOPSI with violations of Title VII of the Civil Rights Act of 1964.

25.

As of March, 1971, a commissioner of the EEOC had charged NOPSI with violating Title VII of the Civil Rights Act of 1964.

26.

As of March, 1971, the EEOC had issued three decisions in which it concluded that there was reasonable cause to believe that NOPSI was engaged in unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964.

27.

At the time NOPSI was scheduled for the 1971 compliance review, there had not been any prior compliance reviews conducted by agencies of the federal government of NOPSI's compliance with Executive Order 11246.

28.

Mr. Patton submitted for review and approval by the contract compliance division of the Office of General Counsel in Washington, D.C., those contractors which were being scheduled for compliance reviews in region 7.

8. See appendices A through E.

29.

By letter dated March 30, 1971, Mr. W.C. Nelson of NOPSI advised Mr. Patton that in the company's view, NOPSI was not subject to Executive Order 11246 and that there did not exist any basis for GSA to conduct a compliance review.

30.

Because more than ten years have elapsed since the scheduling of the 1971 postaward compliance review of NOPSI, Mr. Patton is unable to recall specifically considering all of the standards and criteria referred to in finding of fact # 21, although it was his ordinary business practice to consider these factors. Mr. Patton does not now believe he did otherwise, and the court infers and finds that Mr. Patton did follow his ordinary business practice and consider the factors listed in finding of fact # 21 when he considered NOPSI for a compliance review.

31.

Between fiscal year 1970 and fiscal year 1974, GSA scheduled routine postaward compliance reviews in approximately 97 individual facilities of gas and electric utilities located in GSA Region 7.

In scheduling NOPSI for the 1971 compliance review, GSA followed reasonable administrative standards.

32.

The scheduling of NOPSI for the 1971 compliance review was done pursuant to an administrative plan containing specific neutral criteria.

33.

In scheduling NOPSI for the 1971 compliance review, GSA had specific evidence that NOPSI was in violation of Executive Order 11246.

*Criteria Used In Initiating the 1972 Preaward Compliance Review of NOPSI*

34.

On September 1, 1965, NOPSI and the National Aeronautics and Space Administration ("NASA") signed a formal written

agreement for the provision of electricity and natural gas utility services at NASA's Michoud facility. The formal written contract expired by its own terms on June 30, 1970. This contract contained an equal opportunity clause mandated by Executive Order 10925 (the predecessor of Executive Order 11246), but the equal opportunity clause [and the entire contract, in fact] was specifically "limited in scope" to NOPSI's Michoud operations only.

### 35.

Representatives of NOPSI, NASA, and GSA met in late 1969 and early 1970 to discuss the formulation of a new formal written electrical and natural gas utilities service contract for NASA's Michoud facility. NASA representatives informed NOPSI that they had been directed not to enter any new written contracts which contained "scope limitation" language similar to that contained in the 1965 contract between the parties. After a series of discussions, an impasse halted the negotiations; NASA would not agree to the scope limitation and NOPSI would not agree to the inclusion of the equal opportunity clause of Executive Order 11246 unless NASA would agree to the scope limitation language.

The day after the 1964 contract expired by its own terms, NOPSI's Industrial Representative in charge of NOPSI's relations with federal agencies informed NASA officials, by letter, that because contract negotiations were still continuing between NASA and NOPSI, NOPSI would continue to provide NASA's Michoud facility with electric and gas services as it had done in the past, subject to rate schedules set out in the letter. NOPSI also informed NASA officials that it intended to continue supplying utility services to NASA until further notice from NASA.

### 36.

Since June 30, 1970, NOPSI has provided NASA's Michoud facility with electricity and gas utility services valued in excess of $1 million per year.

### 37.

In pertinent part, 41 CFR § 60–1.20(d) of the regulations implementing Executive Order 11246 provides:

Each agency shall . . . state at the outset of negotiations for each negotiated contract, that if the award, when let, should exceed the amount of $1 million or more, the prospective contractor . . . will be subject to a compliance review before the award of such contract. No such contract shall be awarded unless a preaward compliance review of the prospective contractor . . . has been conducted by the compliance agency within 12 months prior to the award. If an agency other than the awarding agency is the compliance agency, the awarding agency will notify the compliance agency and request appropriate action and findings in accordance with the subsection. . . .

On March 14, 1972, NASA formally requested that GSA conduct a preaward compliance review of NOPSI pursuant to Section 203 of Executive Order 11246 and 41 C.F.R. § 60–1.20 because NASA and GSA were negotiating a written contract with NOPSI for the provision of electricity and natural gas valued at more than $1 million annually at NASA's Michoud facility.

### 38.

By letter dated March 15, 1972, Mr. Patton advised NOPSI of GSA's obligation to conduct a compliance review in light of the negotiations for a written contract in excess of $1 million annually. Mr. Patton proposed to conduct the review during the period of April 11–13, 1972.

### 39.

By letter dated March 21, 1972, William C. Nelson, Vice President and General Counsel of NOPSI, refused GSA's request to conduct a preaward compliance review.

### 40.

By letter dated June 12, 1972, Mr. Mitchell formally advised the Director of OFCC that NOPSI denied being a federal contractor subject to the provisions of Executive Order 11246.

**41.**

The Director of OFCC, in a letter to NOPSI dated July 25, 1972, informed NOPSI of his determination, pursuant to the Secretary of Labor's regulations implementing Executive Order 11246, that NOPSI was a federal contractor subject to Executive Order 11246 and the implementing rules and regulations issued pursuant thereto even though there was no existing formal written agreement between NASA and NOPSI for the provision of electrical and natural gas utility services by NOPSI at NASA's Michoud facility. The letter cited sections 202(5) and 206(a) of the Executive Order 11246, and 41 C.F.R. 60–1.3(m), 41 C.F.R. 60–1.4(d), and 41 C.F.R. 60–1.4(e) of the Secretary of Labor's rules and regulations implementing the Executive Order as grounds for his determination that NOPSI was a government contractor. The Director of OFCC ordered NOPSI to comply with Executive Order 11246 or, in the alternative, to face sanctions pursuant to section 209(a) of Executive Order 11246, including possible referral of the matter to the Department of Justice for appropriate action. This letter also advised NOPSI that GSA would contact NOPSI for the purpose of obtaining NOPSI's voluntary. compliance with Executive Order 11246.

**42.**

By letter dated August 14, 1972, the Assistant Contract Officer for Region 7 wrote NOPSI for the purpose of scheduling a compliance review.

**43.**

On August 21, 1972, NOPSI informed OFCC and GSA by letter that it was NOPSI's position that it was not supplying electricity and natural gas to NASA's Michoud facility pursuant to any contract either written or implied, but was instead supplying the utility services to NASA pursuant to indeterminate permits or franchises granted to NOPSI by its regulatory body, the City Council of New Orleans, which require NOPSI to provide services to all persons requesting them. The letter stated that since there was no contract between NASA and NOPSI, Executive Order 11246 and its implementing rules and regulations did not apply to NOPSI, and that, therefore, there were no grounds for a compliance review by GSA.

**44.**

On September 5, 1972, Mr. Mitchell officially informed OFCC that NOPSI had refused access to conduct a compliance review.

**45.**

By letter dated September 19, 1972, from Philip J. Davis to David L. Rose, OFCC referred the matter of NOPSI's compliance with Executive Order 11246 to the Department of Justice.

**46.**

The attempt to conduct a preaward compliance review of NOPSI in 1972 was pursuant to reasonable administrative standards.

**47.**

The attempt to conduct a preaward compliance review of NOPSI in 1972 was pursuant to an administrative plan containing specific neutral criteria.

## III.

## CONCLUSIONS OF LAW

**1.**

 NOPSI is a government contractor subject to the terms of Executive Order 11246 and the accompanying regulations. *United States v. Mississippi Power and Light Company,* 638 F.2d 899 (5th Cir.1981), cert. denied, 454 U.S. 892, 102 S.Ct. 387, 70 L.Ed.2d 206 (1981).

**2.**

 A company has a Fourth Amendment right to conduct its business free of unreasonable administrative inspections. *Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978); *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978); *See v. Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967).

### 3.

■ The elements to be considered in determining whether the proposed search of NOPSI's records was reasonable under the Fourth Amendment are:

(a) whether the search was authorized;

(b) whether the search was properly limited in scope;

(c) the manner in which the agency chose to initiate the search.

638 F.2d at 907.

### 4.

The Court of Appeals has held as a matter of law that:

(a) the United States is authorized to search NOPSI's records; and

(b) the search was properly limited in scope.

638 F.2d at 908.

### 5.

■ The Court of Appeals has remanded this suit for a determination of whether the manner in which the government chose to initiate the search satisfies Fourth Amendment standards of reasonableness. The determination is proper if the government's decision to review NOPSI's compliance with Executive Order 11246 was based on either:

(a) specific evidence of an existing violation; or

(b) a showing that reasonable legislative or administrative standards for conducting an inspection are satisfied with respect to a particular establishment; or

(c) a showing that the search is pursuant to an administrative plan containing specific neutral criteria.

638 F.2d at 907.

### 6.

The government's decision to review NOPSI's compliance with Executive Order 11246 satisfies the requirements of the Fourth Amendment.

### The Criteria Used In Scheduling NOPSI For the 1971 Compliance Review

### 7.

■ The instructions issued by the government concerning the method of identifying industries and federal contractors within industries for compliance reviews, as set forth in the findings of fact, are reasonable administrative standards which meet the requirements of the Fourth Amendment. These instructions also constitute an administrative plan containing specific neutral criteria.

### 8.

■ The scheduling of NOPSI for the 1971 postaward compliance review was done pursuant to reasonable administrative standards which meet the requirements of the Fourth Amendment.

### 9.

At the time that NOPSI was scheduled for the 1971 compliance review, GSA had specific evidence of an alleged violation of the equal employment opportunity provision of Executive Order 11246.

### 10.

The statistical disparity between the availability and under-utilization of minorities and females as shown by EEO-1 reports and census data constituted specific evidence of a violation of Executive Order 11246 and its implementing regulations. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 337–43, 97 S.Ct. 1843, 1855–58, 52 L.Ed.2d 396 (1977) and cases cited therein.

That is not to say, however, that these statistics are irrefutable or that NOPSI has, in fact, violated Executive Order 11246 and its accompanying regulations. It merely means that GSA did have "specific" although not "irrebuttable", evidence of an existing violation sufficient to support the selection of NOPSI for a compliance review in a manner which satisfies the require-

ments of the Fourth Amendment. Statistics "come in infinite variety, and like any other kind of evidence, they may be rebutted." *International Brotherhood,* supra, 431 U.S. at 341, 97 S.Ct. at 1857. The significance of statistics depends on all of the surrounding facts and circumstances involved, and in this case, I find that the statistics demonstrated specific evidence of an existing violation of the executive order.

Although these statistics do not demonstrate to what extent the "underutilized" minorities and women possessed the requisite skills, this is not a fatal flaw under the particular circumstances involved in this case. To consider but one example, common sense indicates that some number of minority persons, however great or small, would possess the requisite skills to be employed as "Officials and Managers," yet NOPSI employed none in this capacity according to its 1969 Consolidated EEO–1 report. Although only further study would indicate to what extent such minority persons possessed the requisite skills, surely NOPSI does not presume that *no* such persons were within the New Orleans labor force in 1969.

Notwithstanding this "specific evidence," NOPSI could still be in compliance with its equal opportunity obligations if it agreed to remedy any deficiencies which may be discovered. *See* 41 C.F.R. 60–2.10. However, the government is not required to demonstrate noncompliance conclusively or irrebuttably before it would be permitted to review a contractor; at that point, a review would be unnecessary, and such a rule would be illogical.

Furthermore, the government also had other specific evidence of NOPSI's noncompliance with the executive order. As set forth in findings of fact # 24 through 26, NOPSI's file with the EEOC contained complaints,[9] and Mr. Patton testified that it was his typical business practice to call EEOC to determine what complaints had been lodged when he selected companies for compliance reviews. Mr. Patton's best recollection, although understandably not absolutely and unequivocally clear after ten years, does not indicate that he failed to do so in this case.

### The 1972 Attempt To Conduct a Preaward Compliance Review

■ 41 C.F.R. § 60–1.20(d), one of the regulations issued by the Department of Labor, requires that prior to an award of a contract with a value of $1 million or more, the proposed contractor's ability to comply with Executive Order 11246 must be determined, unless a compliance review has been conducted within the preceding twelve months.

This regulatory requirement applied to all contractors who, during the years including 1971 and 1972, were engaged in negotiations for the award of a government contract with a value of $1 million or more. The compliance officer or compliance agency had no discretion on whether to conduct a preaward compliance review under such circumstances.

12.

GSA, on behalf of NASA, was negotiating with NOPSI the terms and conditions of a formal written contract with an annual value of more than $1 million for the provisions of natural gas and utility services and, therefore, GSA was required to conduct a review of NOPSI's ability to comply with Executive Order 11246.

13.

It was appropriate for the government to seek to conduct a preaward compliance review of NOPSI at a time when NOPSI was

9. The complaints involved violations of Title VII of the Civil Rights Act of 1964 which, identical to Executive Order 11246, prohibits discrimination based on race, sex, religion, and national origin. Therefore, an allegation that an employer's practices violated Title VII would also be grounds for believing that the employer's practices violated the Executive Order.

providing services to the government. At the hearing held on July 8th and 9th, 1974, Mr. Mitchell clearly stated GSA's policy concerning preaward reviews where there is an ongoing relationship between the government and the proposed contractor:

If, at the time, there is an ongoing contract but there has not been an on-site review and there is contemplated a $1,000,000 or more contract then we would have to go in and do a Pre-award Examination even though the contractor at that time was performing a current one with the Federal Government.

The fact that NOPSI had earlier refused to permit a review to be conducted adds some support to the necessity of conducting a preaward review of NOPSI. The Federal government has an interest in assuring that services are furnished to it at the lowest possible cost. This is especially true where competitive bidding is not possible because the services must be supplied by a contractor who is the "sole source" for such services. Discriminatory employment practices increase costs to the federal government. *NAACP v. Federal Power Commission,* 425 U.S. 662, 668, 96 S.Ct. 1806, 1810, 48 L.Ed.2d 284 (1976).

### 14.

■ 41 C.F.R. § 60–1.20(d) removes "unbridled discretion" from the compliance officer "as to when and whom to search." *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 323, 98 S.Ct. 1816, 1825, 56 L.Ed.2d 305 (1978). This regulation establishes a reasonable administrative standard to conduct a compliance review of NOPSI, and also constitutes an administrative plan containing specific neutral criteria to conduct a compliance review.

### *The Compliance Review Program And Warrant Requirements*

### 15.

■ A warrant or its equivalent is not constitutionally required to implement an inspection of commercial property if:

a) the inspection is authorized by law;

b) such inspections are necessary for the furtherance of substantial federal interests;

c) a warrant requirement would significantly frustrate the purpose of the act; and

d) the inspection program provides an adequate substitute for a warrant in terms of the certainty and regularity of its application.

*Donovan v. Dewey,* 452 U.S. 594, 101 S.Ct. 2534, 2538–39, 69 L.Ed.2d 262 (1981).

### 16.

■ Congress, through the Federal Property Act, and the Civil Rights Act of 1964 and its 1972 amendments has provided statutory authority for Section 202(5) of Executive Order 11246 and for 41 C.F.R. 60–1.4(a)(5), both of which require government contractors to permit access to their books, accounts and records to ascertain compliance with Executive Order 11246 and its implementing regulations. *United States v. Mississippi Power and Light Co.,* 638 F.2d at 904–06.

### 17.

■ The elimination of discriminatory employment practices is a national interest of the highest priority. *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 763, 96 S.Ct. 1251, 1263, 47 L.Ed.2d 444 (1976); *Alexander v. Gardner-Denver,* 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974). Executive Order 11246 embodies a substantial federal interest in eliminating discriminatory employment practices.

### 18.

The Secretary of Labor's regulations requiring contractors to permit access to their books, records, accounts and other materials are essential to the effective implementation of the Executive Order. *Uniroyal v. Marshall,* 482 F.Supp. 364, 372 (D.D.C.1979).

See also *Uniroyal v. Marshall,* 14 EDP 7798 (N.D.Ind.1977), aff'd, 579 F.2d 1060 (7th Cir.1978). Cf. *United States v. Morton Salt Co.,* 338 U.S. 632, 642, 70 S.Ct. 357, 363, 94 L.Ed. 401 (1950); *United States v. Davey,* 543 F.2d 996, 999 (2d Cir.1976).

19.

■ A statutorily authorized inspection program provides an adequate substitute for a warrant in terms of the certainty and regularity of its application if:

a) the act clearly notifies the operator of the facility that inspections will be performed on a regular basis;

b) the act and regulations issued thereunder inform the operator about what standards must be met; and

c) the act prohibits forcible entry and instead, requires the government, when refused entry to a facility, to resort to administrative and/or judicial process, thus providing a means by which any special Fourth Amendment interests can be accommodated.

*Donovan, supra.*

20.

Executive Order 11246 and its long history of application to all government contractors serve as notice to such contractors that inspections will be performed.

21.

■ Executive Order 11246 and its implementing regulations clearly establish a standard of nondiscrimination and affirmative action in employment that informs contractors of the requirements with which they must comply, and properly defines and limits the scope of the government's inspection.

22.

■ The regulatory scheme embodied in 41 C.F.R. 60–1.26 adequately safeguards any special Fourth Amendment interests of the contractors by requiring the government to resort to administrative or judicial process when a contractor refuses to allow access to its records.

23.

■ The compliance review program involved in this case provided a constitutionally adequate substitute for a warrant in terms of the certainty and regularity of its application.

IV.

CONCLUSION

For all of the foregoing reasons, I find that the government attempts to review NOPSI's compliance with Executive Order 11246 in 1971 and 1972 pass muster under the Fourth Amendment test of reasonableness. The decision to inspect NOPSI's records was not "the product of the unreviewed discretion of the enforcement officer in the field." *See v. Seattle,* 387 U.S. 541, 545, 87 S.Ct. 1737, 1740, 18 L.Ed.2d 943 (1967).

## APPENDIX A

A comparison of NOPSI's consolidated 1969 EEO-1 report with the experienced civilian labor force for the New Orleans SMSA (from the 1960 Census) shows:

(1.) COMPARISON OF NOPSI'S WORKFORCE AS REPORTED ON ITS CONSOLIDATED 1969 EEO-1 REPORT AND THE EXPERIENCED CIVILIAN LABOR FORCE IN THE NEW ORLEANS STANDARD METROPOLITAN STATISTICAL AREA (SMSA) AS REPORTED IN THE 1960 CENSUS OF POPULATION

| EEO–Category | NOPSI'S Consolidated 1969 EEO–1 Report | | Experienced Civilian Labor Force New Orleans SMSA – 1960 Census | |
|---|---|---|---|---|
| | Total No. Employed In Category | No. and % Minorities (Nonwhite) Employed In Category | Total No. In Category | No. and % Minorities (Nonwhite) In Category |
| Officials and Managers | 280 | 0 | 29,644 [1] | 1,446 (4.88%) |
| Professionals and Technicians [2] | 299 | 4 (1.34%) | 34,633 | 3,825 (11.04%) |
| Sales Workers | 57 | 1 (1.75%) | 23,740 | 1,335 (5.62%) |
| Office and Clerical | 444 | 15 (3.38%) | 51,923 | 3,851 (7.42%) |
| Craftsmen | 688 | 60 (8.72%) | 38,513 | 6,018 (15.63%) |
| Operatives | 1,165 | 403 (34.59%) | 46,818 | 17,630 (37.66%) |
| Laborers | 86 | 68 (79.07%) | 24,860 [3] | 16,863 (67.83%) |
| Service Workers | 59 | 54 (91.53%) | 33,499 [4] | 18,121 (54.09%) |

[1] Excludes farm officials and managers.

[2] Professional and technical EEO–1 categories are combined because the 1960 census data does not distinguish between the two categories.

[3] Excludes farm and mine laborers.

[4] Excludes private household service workers.

SOURCES: Consolidated 1969 Equal Employment Opportunity Employer Information Report EEO–1 filed by NOPSI and dated May 19, 1969; and 1960 Census of Population, Volume I, Part 20 (Louisiana), Table 122.

(2) COMPARISON OF NOPSI'S WORKFORCE AS REPORTED ON ITS CONSOLIDATED 1969 EEO–1 REPORT AND THE EXPERIENCED CIVILIAN LABOR FORCE IN THE NEW ORLEANS STANDARD METROPOLITAN STATISTICAL AREA (SMSA) AS REPORTED IN THE 1960 CENSUS OF POPULATION

| EEO–Category | NOPSI'S Consolidated 1969 EEO–1 Report | | Experienced Civilian Labor Force New Orleans SMSA – 1960 Census | |
|---|---|---|---|---|
| | Total No. Employed In Category | No. and % Females Employed In Category | Total No. In Category | No. and % Females In Category |
| Officials and Managers | 280 | 3 (1.07%) | 29,644 [1] | 3,956 (13.35%) |
| Professionals and Technicians [2] | 299 | 12 (4.01%) | 34,633 | 13,545 (39.11%) |
| Sales Workers | 57 | 2 (3.51%) | 23,740 | 8,636 (36.38%) |
| Office and Clerical | 444 | 221 (49.78%) | 51,923 | 32,043 (61.71%) |
| Craftsmen | 688 | 2 (0.29%) | 38,513 | 920 (2.39%) |
| Operatives | 1,165 | 0 | 46,818 | 9,858 (21.06%) |
| Laborers | 86 | 0 | 24,860 [3] | 659 (2.65%) |
| Service Workers | 59 | 7 (11.86%) | 33,499 [4] | 16,127 (48.14%) |

[1] Excludes farm officials and managers.

[2] Professional and technical EEO–1 categories are combined because the 1960 census data does not distinguish between the two categories.

[3] Excludes farm and mine laborers.

[4] Excludes private household service workers.

SOURCES: Consolidated 1969 Equal Employment Opportunity Employer Information Report EEO–1 filed by NOPSI and dated May 19, 1969; and 1960 Census of Population, Volume I, Part 20 (Louisiana), Table 122.

## APPENDIX B

A comparison of NOPSI's consolidated 1970 EEO–1 report with the experienced civilian labor force for the New Orleans SMSA (from the 1960 Census) shows:

(1.) COMPARISON OF NOPSI'S WORKFORCE AS REPORTED ON ITS CONSOLIDATED 1970 EEO–1 REPORT AND THE EXPERIENCED CIVILIAN LABOR FORCE IN THE NEW ORLEANS STANDARD METROPOLITAN STATISTICAL AREA (SMSA) AS REPORTED IN THE 1960 CENSUS OF POPULATION

| EEO–Category | NOPSI'S Consolidated 1970 EEO–1 Report | | Experienced Civilian Labor Force New Orleans SMSA – 1960 Census | |
| --- | --- | --- | --- | --- |
| | Total No. Employed In Category | No. and % Minorities (Nonwhite) Employed In Category | Total No. In Category | No. and % Minorities (Nonwhite) In Category |
| Officials and Managers | 291 | 2 (0.69%) | 29,644 [1] | 1,446 (4.88%) |
| Professionals and Technicians [2] | 314 | 7 (2.23%) | 34,633 | 3,825 (11.04%) |
| Sales Workers | 55 | 2 (3.64%) | 23,740 | 1,335 (5.62%) |
| Office and Clerical | 457 | 14 (3.06%) | 51,923 | 3,851 (7.42%) |
| Craftsmen | 697 | 71 (10.19%) | 38,513 | 6,018 (15.63%) |
| Operatives | 1,119 | 493 (44.06%) | 46,818 | 17,630 (37.66%) |
| Laborers | 61 | 53 (86.89%) | 24,860 [3] | 16,863 (67.83%) |
| Service Workers | 58 | 54 (93.10%) | 33,499 [4] | 18,121 (54.09%) |

[1] Excludes farm officials and managers.

[2] Professional and technical EEO–1 categories are combined because the 1960 census data does not distinguish between the two categories.

[3] Excludes farm and mine laborers.

[4] Excludes private household service workers.

SOURCES: Consolidated 1970 Equal Employment Opportunity Employer Information Report EEO–1 filed by NOPSI and dated May 29, 1970; and 1960 Census of Population, Volume I, Part 20 (Louisiana), Table 122.

(2.) COMPARISON OF NOPSI'S WORKFORCE AS REPORTED ON ITS CONSOLIDATED 1970 EEO–1 REPORT AND THE EXPERIENCED CIVILIAN LABOR FORCE IN THE NEW ORLEANS STANDARD METROPOLITAN STATISTICAL AREA (SMSA) AS REPORTED IN THE 1960 CENSUS OF POPULATION

| EEO–Category | NOPSI'S Consolidated 1970 EEO–1 Report | | Experienced Civilian Labor Force New Orleans SMSA – 1960 Census | |
| --- | --- | --- | --- | --- |
| | Total No. Employed In Category | No. and % Females Employed In Category | Total No. In Category | No. and % Females In Category |
| Officials and Managers | 291 | 3 (1.07%) | 29,644 [1] | 3,956 (13.35%) |
| Professionals and Technicians [2] | 314 | 9 (2.87%) | 34,633 | 13,545 (39.11%) |
| Sales Workers | 55 | 5 (9.09%) | 23,740 | 8,636 (36.38%) |
| Office and Clerical | 457 | 221 (48.36%) | 51,923 | 32,043 (61.71%) |
| Craftsmen | 697 | 1 (0.14%) | 38,513 | 920 (2.39%) |
| Operatives | 1,119 | 0 | 46,818 | 9,858 (21.06%) |
| Laborers | 61 | 1 (1.64%) | 24,860 [3] | 659 (2.65%) |
| Service Workers | 58 | 8 (13.79%) | 33,499 [4] | 16,127 (48.14%) |

[1] Excludes farm officials and managers.

[2] Professional and technical EEO–1 categories are combined because the 1960 census data does not distinguish between the two categories.

[3] Excludes farm and mine laborers.

[4] Excludes private household service workers.

SOURCES: Consolidated 1970 Equal Employment Opportunity Employer Information Report EEO–1 filed by NOPSI and dated May 29, 1970; and 1960 Census of Population, Volume I, Part 20 (Louisiana), Table 122.

## APPENDIX C

A comparison of NOPSI's consolidated 1969 EEO–1 report with the experienced civilian labor force for the New Orleans SMSA (1970 Census) shows:

(1) COMPARISON OF NOPSI'S WORKFORCE AS REPORTED ON ITS CONSOLIDATED 1969 EEO–1 REPORT AND THE EXPERIENCED CIVILIAN LABOR FORCE IN THE NEW ORLEANS STANDARD METROPOLITAN STATISTICAL AREA (SMSA) AS REPORTED IN THE 1970 CENSUS OF POPULATION

| EEO–Category | NOPSI'S Consolidated 1969 EEO–1 Report | | Experienced Civilian Labor Force New Orleans SMSA – 1970 Census | |
|---|---|---|---|---|
| | Total No. Employed In Category | No. and % Minorities (Nonwhite) Employed In Category | Total No. In Category | No. and % Minorities (Nonwhite) In Category |
| Officials and Managers | 280 | 0 | 34,268 [1] | 3,387 (9.88%) |
| Professionals and Technicians [2] | 299 | 4 (1.34%) | 58,146 | 10,116 (17.40%) |
| Sales Workers | 57 | 1 (1.75%) | 30,631 | 4,163 (13.59%) |
| Office and Clerical | 444 | 15 (3.38%) | 75,935 | 15,080 (19.86%) |
| Craftsmen | 688 | 60 (8.72%) | 52,433 | 12,085 (23.05%) |
| Operatives | 1,165 | 403 (34.59%) | 52,487 [3] | 23,718 (45.19%) |
| Laborers | 86 | 68 (79.07%) | 22,705 [4] | 14,508 (63.90%) |
| Service Workers | 59 | 54 (91.53%) | 47,269 [5] | 25,583 (54.12%) |

[1] Excludes farm managers and administrators.

[2] Professional and technical EEO–1 categories are combined because the 1970 census data does not distinguish between the two categories.

[3] Includes transport operatives.

[4] Excludes farm laborers.

[5] Excludes private household service workers.

SOURCES: Consolidated 1969 Equal Employment Opportunity Employer Information Report EEO–1 filed by NOPSI and dated May 19, 1969; and 1970 Census of Population, Volume I, Part 20 (Louisiana), Table 172.

(2) COMPARISON OF NOPSI'S WORKFORCE AS REPORTED ON ITS CONSOLIDATED 1969 EEO–1 REPORT AND THE EXPERIENCED CIVILIAN LABOR FORCE IN THE NEW ORLEANS STANDARD METROPOLITAN STATISTICAL AREA (SMSA) AS REPORTED IN THE 1970 CENSUS OF POPULATION

| EEO–Category | NOPSI'S Consolidated 1969 EEO–1 Report | | Experienced Civilian Labor Force New Orleans SMSA – 1970 Census | |
|---|---|---|---|---|
| | Total No. Employed In Category | No. and % Females Employed In Category | Total No. In Category | No. and % Females In Category |
| Officials and Managers | 280 | 3 (1.07%) | 34,268 [1] | 5,531 (16.14%) |
| Professionals and Technicians [2] | 299 | 12 (4.01%) | 58,146 | 23,600 (40.59%) |
| Sales Workers | 57 | 2 (3.51%) | 30,361 | 11,917 (38.91%) |
| Office and Clerical | 444 | 221 (49.78%) | 75,935 | 53,077 (69.90%) |
| Craftsmen | 688 | 2 (0.29%) | 52,433 | 2,100 (4.01%) |
| Operatives | 1,165 | 0 | 52,487 [3] | 10,491 (19.99%) |
| Laborers | 86 | 0 | 22,705 [4] | 1,499 (6.60%) |
| Service Workers | 59 | 7 (11.86%) | 47,269 [5] | 25,334 (53.60%) |

[1] Excludes farm managers and administrators.

[2] Professional and technical EEO–1 categories are combined because the 1960 census data does not distinguish between the two categories.

[3] Includes transport operatives.

[4] Excludes farm laborers.

[5] Excludes private household service workers.

SOURCES: Consolidated 1969 Equal Employment Opportunity Employer Information Report EEO–1 filed by NOPSI and dated May 19, 1969; and 1970 Census of Population, Volume I, Part 20 (Louisiana), Table 172.

## APPENDIX D

A comparison of NOPSI's consolidated 1970 EEO–1 report with the experienced civilian labor force for the New Orleans SMSA (1970 Census) shows:

(1) COMPARISON OF NOPSI'S WORKFORCE AS REPORTED ON ITS CONSOLIDATED 1970 EEO–1 REPORT AND THE EXPERIENCED CIVILIAN LABOR FORCE IN THE NEW ORLEANS STANDARD METROPOLITAN STATISTICAL AREA (SMSA) AS REPORTED IN THE 1970 CENSUS OF POPULATION.

| | NOPSI'S Consolidated 1970 EEO–1 Report | | Experienced Civilian Labor Force New Orleans SMSA – 1970 Census | |
| EEO–Category | Total No. Employed In Category | No. and % Minorities (Nonwhite) Employed In Category | Total No. In Category | No. and % Minorities (Nonwhite) In Category |
|---|---|---|---|---|
| Officials and Managers | 291 | 2 (0.69%) | 34,268 [1] | 3,387 (9.88%) |
| Professionals and Technicians [2] | 314 | 7 (2.23%) | 58,146 | 10,116 (17.40%) |
| Sales Workers | 55 | 2 (3.64%) | 30,631 | 4,163 (13.59%) |
| Office and Clerical | 457 | 14 (3.06%) | 75,935 | 15,080 (19.86%) |
| Craftsmen | 697 | 71 (10.19%) | 52,433 | 12,085 (23.05%) |
| Operatives | 1,119 | 493 (44.06%) | 52,487 [3] | 23,718 (45.19%) |
| Laborers | 61 | 53 (86.89%) | 22,705 [4] | 14,508 (63.90%) |
| Service Workers | 58 | 54 (93.10%) | 47,269 [5] | 25,583 (54.12%) |

[1] Excludes farm managers and administrators.

[2] Professional and technical EEO–1 categories are combined because the 1970 census data does not distinguish between the two categories.

[3] Includes transport operatives.

[4] Excludes farm laborers.

[5] Excludes private household service workers.

SOURCES: Consolidated 1970 Equal Employment Opportunity Employer Information Report EEO–1 filed by NOPSI and dated May 29, 1970; and 1970 Census of Population, Volume I, Part 20 (Louisiana), Table 172.

(2) COMPARISON OF NOPSI'S WORKFORCE AS REPORTED ON ITS CONSOLIDATED 1970 EEO-1 REPORT AND THE EXPERIENCED CIVILIAN LABOR FORCE IN THE NEW ORLEANS STANDARD METROPOLITAN STATISTICAL AREA (SMSA) AS REPORTED IN THE 1970 CENSUS OF POPULATION

| EEO–Category | NOPSI'S Consolidated 1970 EEO–1 Report | | Experienced Civilian Labor Force New Orleans SMSA – 1970 Census | |
|---|---|---|---|---|
| | Total No. Employed In Category | No. and % Females Employed In Category | Total No. In Category | No. and % Females In Category |
| Officials and Managers | 291 | 3 (1.03%) | 34,268 [1] | 5,531 (16.14%) |
| Professionals and Technicians [2] | 314 | 9 (2.87%) | 58,146 | 23,600 (40.59%) |
| Sales Workers | 55 | 5 (9.09%) | 30,631 | 11,917 (38.91%) |
| Office and Clerical | 457 | 221 (48.36%) | 75,935 | 53,077 (69.90%) |
| Craftsmen | 697 | 1 (0.14%) | 52,433 | 2,100 (4.01%) |
| Operatives | 1,119 | 0 | 52,487 [3] | 10,491 (19.99%) |
| Laborers | 61 | 1 (1.64%) | 22,705 [4] | 1,499 (6.60%) |
| Service Workers | 58 | 8 (13.79%) | 47,269 [5] | 25,334 (53.60%) |

[1] Excludes farm managers and administrators.

[2] Professional and technical EEO–1 categories are combined because the 1970 census data does not distinguish between the two categories.

[3] Includes transport operatives.

[4] Excludes farm laborers.

[5] Excludes private household service workers.

SOURCES: Consolidated 1970 Equal Employment Opportunity Employer Information Report EEO–1 filed by NOPSI and dated May 29, 1970; and 1970 Census of Population, Volume I, Part 20 (Louisiana), Table 172.

## APPENDIX E

An analysis of NOPSI's 1969 and 1970 EEO–1 reports shows:

(1) ANALYSIS OF NOPSI'S CONSOLIDATED 1969 AND 1970 EEO–1
REPORTS COMPARING DISTRIBUTION OF MALE AND
FEMALE EMPLOYEES AMONG EEO–1 CATEGORIES

| EEO–1 Category | NOPSI'S Consolidated 1969 EEO–1 Report | | NOPSI'S Consolidated 1970 EEO–1 Report | |
| --- | --- | --- | --- | --- |
| | No. and % of Total Males Employed In Category | No. and % of Total Females Employed In Category | No. and % of Total Males Employed In Category | No. and % of Total Females Employed In Category |
| Officials and Managers | 277 (9.78%) | 3 (1.22%) | 288 (10.27%) | 3 (1.21%) |
| Professionals | 145 (5.12%) | 10 (4.05%) | 141 (5.03%) | 9 (3.63%) |
| Technicians | 142 (5.02%) | 2 (0.81%) | 164 (5.85%) | 0 |
| Sales Workers | 55 (1.94%) | 2 (0.81%) | 50 (1.78%) | 5 (2.02%) |
| Office and Clerical | 223 (7.88%) | 221 (89.47%) | 236 (8.42%) | 221 (89.11%) |
| Craftsmen | 686 (24.23%) | 2 (0.81%) | 696 (24.82%) | 1 (0.40%) |
| Operatives | 1,165 (41.15%) | 0 | 1,119 (39.91%) | 0 |
| Laborers | 86 (3.08%) | 0 | 60 (2.14%) | 1 (0.40%) |
| Service Workers | 52 (1.84%) | 7 (2.83%) | 50 (1.78%) | 8 (3.23%) |
| Total | 2,831 (100%) | 247 (100%) | 2,804 (100%) | 248 (100%) |

SOURCES: Consolidated 1969 and 1970 Equal Employment Opportunity Employer
Information Reports EEO–1 filed by NOPSI and dated May 19, 1969, and
May 29, 1970, respectively.

(2) ANALYSIS OF NOPSI'S CONSOLIDATED 1969 AND 1970 EEO–1 REPORTS COMPARING DISTRIBUTION OF WHITE AND MINORITY EMPLOYEES AMONG EEO–1 CATEGORIES

| EEO–1 Category | NOPSI'S Consolidated 1969 EEO–1 Report | | NOPSI'S Consolidated 1970 EEO–1 Report | |
|---|---|---|---|---|
| | No. and % of Total Whites Employed In Category | No. and % of Total Minorities Employed In Category | No. and % of Total Whites Employed In Category | No. and % of Total Minorities Employed In Category |
| Officials and Managers | 280 (11.32%) | 0 | 289 (12.27%) | 2 (.29%) |
| Professionals | 154 (6.23%) | 1 (.17%) | 148 (6.28%) | 2 (.29%) |
| Technicians | 141 (5.7%) | 3 (.5%) | 159 (6.75%) | 5 (.72%) |
| Sales Workers | 56 (2.26%) | 1 (.17%) | 53 (2.25%) | 2 (.29%) |
| Office and Clerical | 429 (17.35%) | 15 (2.48%) | 443 (18.80%) | 14 (2.01%) |
| Craftsmen | 628 (25.39%) | 60 (9.92%) | 626 (26.57%) | 71 (10.2%) |
| Operatives | 762 (30.81%) | 403 (66.61%) | 626 (26.57%) | 493 (70.83%) |
| Laborers | 18 (.73%) | 68 (11.24%) | 8 (.34%) | 53 (7.61%) |
| Service Workers | 5 (.2%) | 54 (8.93%) | 4 (.17%) | 54 (7.76%) |
| Total | 2,473 (100%) | 605 (100%) | 2,356 (100%) | 696 (100%) |

SOURCES: Consolidated 1969 and 1970 Equal Employment Opportunity Employer Information Reports EEO–1 filed by NOPSI and dated May 19, 1969, and May 29, 1970, respectively.