638 F.2d 899
 25 Fair Empl.Prac.Cas. 250,
25 Empl. Prac. Dec. P 31,628
UNITED STATES of America, Plaintiff-Appellee,
v.
MISSISSIPPI POWER & LIGHT COMPANY, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
NEW ORLEANS PUBLIC SERVICE, INC., Defendant-Appellant.
 Nos. 79-2636, 80-3043.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit A
 March 6, 1981.
 E. Grady Jolly, Michael Farrell, Sherwood Wise, Jackson, Miss., for defendant-appellant in No. 79-2636.
 George Phillips, U. S. Atty., Jackson, Miss., Louis G. Ferrand, Jr., John M. Gadzichowski, Attys., James D. Henry, Assoc. Sol., Carin Clauss, Sol. of Labor, Drew S. Days, U. S. Dept. of Justice, Civil Rights Div., Washington, D. C., for plaintiff-appellee in No. 79-2636.
 Milling, Benson, Woodward, Hillyer, Pierson & Miller, Michael J. Molony, Jr., New Orleans, La., for defendant-appellant in No. 80-3043.
 John P. Volz, U. S. Atty., New Orleans, La., for plaintiff-appellee in No. 80-3043.
 David L. Rose, Fed. Enf. Sec., Thomas P. Carney, U. S. Dept. of Justice, Civil Rights Div., Washington, D. C., for plaintiff-appellee in both cases.
 Appeal from the United States District Court for the Southern District of Mississippi.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before WISDOM, GARZA and REAVLEY, Circuit Judges.
 WISDOM, Circuit Judge:
 
 
 1
 These companion cases are before the Court for the second time. The Attorney General, on behalf of the United States, brought these actions in 1973 and 1974 against New Orleans Public Service, Inc. (NOPSI) and Mississippi Power & Light (MP&L), contending that, as government contractors, those companies were bound by Executive Order (E.O.) 11246, as amended, and the regulations of the Secretary of Labor promulgated under it, 41 C.F.R. § 60.1 et seq. That order imposes on government contractors the obligation to take affirmative action to achieve the equal opportunity goals of the E.O.'s mandate (in effect, to increase the hiring of members of racial and ethnic minorities.)[1] More specifically, the United States sought injunctions to obtain access to the companies' records to determine whether they had complied with the mandates of the executive order. The companies resisted the inspection on a number of grounds which are detailed extensively in this Court's first opinions in these cases. United States v. New Orleans Public Service, Inc., 5 Cir. 1977, 553 F.2d 459; United States v. Mississippi Power & Light Co., 5 Cir. 1977, 553 F.2d 480. The primary challenges in those cases centered on the constitutional validity of the executive order and relevant regulations, on whether the mandates of the order could be imposed on the companies without their contractual consent, and on whether, and to what extent, the fourth amendment protected the companies' records from government view.
 
 
 2
 The district courts granted the injunctions. On appeal, we held that the executive order and the regulations were congressionally authorized and therefore could validly be applied to the defendant companies. We also rejected the companies' fourth amendment arguments, but withheld the injunctive relief granted by the district courts. Instead, relying on the declaratory force of our decisions and the good faith of the parties, we allowed the companies to comply voluntarily and authorized the government to seek through administrative proceedings to resolve any remaining issues concerning access to the companies' records.
 
 
 3
 The Supreme Court granted certiorari and vacated our decision for reconsideration in light of Marshall v. Barlow's, Inc., 1978, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305, a decision subsequent to this Court's decision, which cast some shadows on the rationale underlying our resolution of the fourth amendment issues. 436 U.S. 942, 98 S.Ct. 2841, 56 L.Ed.2d 783. We in turn remanded the cases to the respective district courts with the same directions. 577 F.2d 1030. Both courts concluded that Barlow's did not dictate a reversal of their earlier rulings and entered orders that were similar to the order issued by this Court before the Supreme Court's review. Because we disagree in part with the district courts, we must vacate their orders and remand for further findings.
 
 I.
 
 4
 The United States raises an initial question, ignored by the appellants, whether the two orders issued by the district courts are final decisions within the meaning of 28 U.S.C. § 1291. If the decisions are not final, we do not have jurisdiction over these appeals.[2] Although the opinions and orders in these two cases differ somewhat, the effects of the two dispositions are the same. Both courts authorized the United States to proceed through administrative action to force the companies to comply with the executive order and the regulations. Both courts also concluded that the companies had no further fourth amendment defenses to the proposed inspections and that their refusal to allow the inspections violated the executive order. Neither court issued the injunctions sought by the government. Like this Court in its first decision, they were willing to rely instead on the declaratory force of their decisions and on the good faith of the parties. Both courts retained jurisdiction, however, in the event that enforcement of their decisions became necessary.[3]
 
 
 5
 Gillespie v. United States Steel Corp., 1964, 379 U.S. 148, 85 S.Ct. 308, 13 L.Ed.2d 199, furnishes the analytical framework for determining whether these orders are final within the meaning of § 1291. As that case points out, "a decision final within the meaning of § 1291 does not necessarily mean the last order possible to be made in a case". Id. at 152, 85 S.Ct. at 310. Thus, although the withholding of injunctive relief and retention of jurisdiction by the district courts in these cases makes it possible that they will be called on to issue another order to enforce their decisions, that fact alone is not dispositive on the issue of finality. Thoms v. Heffernan, 2 Cir. 1973, 473 F.2d 478, vacated on other grounds, 1974, 418 U.S. 908, 94 S.Ct. 3199, 41 L.Ed.2d 1154.
 
 
 6
 Rather, Gillespie dictates that we give the finality requirement a "practical rather than a technical construction" and that the chief countervailing considerations are "the inconvenience and costs of piecemeal review on the one hand and the danger of denying justice by delay on the other". 379 U.S. at 152-53 (quoting Cohen v. Beneficial Industrial Loan Corp., 1949, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 and Dickinson v. Petroleum Conversion Corp., 1949, 338 U.S. 507, 511, 70 S.Ct. 322, 94 L.Ed. 299). With these considerations in mind, we conclude that the orders are sufficiently final to vest us with jurisdiction.
 
 
 7
 Our review of these orders does not raise the usual problems attending piecemeal review because it can be labelled "piecemeal" only in a distorted sense of the word. The orders would be undeniably final if the court had either granted or denied the injunctive relief asked for by the government instead of retaining jurisdiction to issue injunctions later if needed. The district courts otherwise fully decided every issue presented, including the two central issues before us now. These two substantive issues have formed the core of these cases from their inception, are the same issues we faced when the cases were first appealed to us, and are the same issues on which the Supreme Court granted certiorari before vacating our first judgment. These appeals are in effect a continuation of the first appeals. To resolve these issues now would impose no further inconvenience on the progress of this litigation. Indeed, refusal to decide these cases now would create cost and inconvenience without any benefit either to the parties or to the orderly administration of the appellate system. Should we refuse, the government will again seek to obtain the companies' records through administrative proceedings; the companies will again raise the two issues presented here; the government will apply to the district courts for an injunction; and, relying on their prior decisions, the courts will grant injunctions that will be clearly appealable under 28 U.S.C. § 1292(a)(1). The issues would in no way be better suited for appellate review than they are now, but the parties will have suffered the cost and delay that would attend this unnecessary use of administrative and judicial resources. And, given the unusual procedural history of these appeals, we need not fear that our decision to hear these appeals will open the door to a host of other appeals that are truly "piecemeal".[4]
 
 
 8
 Liberty Mutual Insurance Co. v. Wetzel, 1976, 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435, relied on heavily by the government, is inapposite. Appeal was denied there because the district court had issued a partial summary judgment, deciding for the plaintiffs only on the issue of liability but leaving open all issues concerning the relief sought. That is not the situation in these cases. The district courts decided every issue, including the appropriate relief.
 
 II.
 
 9
 After the decisions in these cases were vacated and remanded to this Court, the Supreme Court issued its opinion in Chrysler Corp. v. Brown, 1979, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208. The defendant companies argue that the case casts doubt on the statutory authorization we found for E.O. 11246 and that Chrysler therefore undermines our first decision.[5]
 
 
 10
 Chrysler Corporation brought suit against the Office of Federal Contract Compliance Programs (OFCCP), the agency charged with monitoring compliance with E.O. 11246. Chrysler sought an injunction to block that agency's public disclosure of information that the executive order had required Chrysler to furnish to the government. Chrysler argued, among other things, that public disclosure was barred by the Trade Secrets Act, 18 U.S.C. § 1905, which prohibits federal officials from releasing any information they receive in the course of their employment "in any manner not authorized by law". The OFCCP countered that certain of its regulations, promulgated under authority granted by E.O. 11246, had the force and effect of law and thus provided the necessary authorization to take the proposed disclosure outside the reach of the Trade Secrets Act. This argument in turn was premised on the validity of the executive order itself. The OFCCP found congressional authorization for E.O. 11246 in the Federal Procurement and Administrative Services Act,[6] the Civil Rights Act of 1964,[7] and the Equal Employment Opportunity Act of 1972.[8] These were the same sources this Court relied on in reaching its first decision in these cases.
 
 
 11
 The Supreme Court held that the regulations did not have the force and effect of law. In so holding, however, the Supreme Court did not reach the issue whether E.O. 11246 was within the scope of the statutory grants of authority relied on by the OFCCP. Rather, the pertinent inquiry was whether the regulations themselves were within the contemplation of the statutory grants of authority. The Court concluded that they were not.
 
 
 12
 We are unable to agree with the suggestion that the Supreme Court's failure to reach the question whether the executive order was within any grant of congressionally delegated authority impugns our earlier decision in these cases. To have found that E.O. 11246 was authorized by statute would have been pointless. Such a holding would not have aided the Court in deciding the pertinent question whether there was enough of a nexus between the regulations at issue and the cited sources of authority to give those regulations the "force and effect of law". Thus, we can hardly draw any negative inference from the Court's failure to reach the issue of the validity of the executive order. Indeed, if any inference can be drawn, it could just as well be the opposite one. Had the Supreme Court held that the executive order was not valid, that would have sounded the death knell for the regulations promulgated under it. The Supreme Court's refusal to take this approach implies, equally well, a willingness to accept the validity of the executive order. We thus hold fast to our previous determination that E.O. 11246 was a proper exercise of congressionally delegated authority.
 
 
 13
 By establishing a course of analysis different from the one we used for determining whether regulations promulgated under E.O. 11246 have the force and effect of law, the Chrysler case does require us to reexamine the regulation in dispute in these cases, 41 C.F.R. § 60-1.4(e) (1979).[9] Our conclusion as to its validity, however, remains the same. Chrysler establishes two prerequisites for a regulation to have the force and effect of law. The promulgation of the regulation must satisfy the procedural requirements imposed by Congress, and, as stated above, it must be within the contemplation of some congressionally delegated authority. Unlike the regulations at issue in Chrysler, the promulgation of 41 C.F.R. § 60-1.4(e) (1979) did comport with the provisions of § 4 of the Administrative Procedure Act, 5 U.S.C. § 553.[10] Our analysis turns then to whether the regulation is contemplated by the sources of congressional authority we cite for it.
 
 
 14
 That analysis begins with the conclusion we have already reached: Chrysler does not undermine our holding that E.O. 11246 is itself firmly rooted in congressionally delegated authority. From there it is but a short step to the conclusion that the regulation is also within the contemplation of that grant of authority. The order states that, with a few exceptions, all government contracts shall include a clause requiring the party contracting with the government to take affirmative action to increase the hiring of members of racial minorities and other traditionally disadvantaged groups. The regulation merely states that such a clause is deemed a part of all government contracts whether or not the contract is written and whether or not the clause is physically incorporated in the contract. The regulation is an evocation of the strict policy that the affirmative action obligation is an understood and unalterable part of doing business with the government. If the federal government has the power to impose the affirmative action obligation at all, it must certainly have the power to impose it without exception. As we stated in United States v. New Orleans Public Service, Inc., 553 F.2d at 465, the regulation does "nothing more than give teeth to the mandate of the Order".
 
 
 15
 Our holding that the executive order can validly be applied to NOPSI and MP&L does not, however, rest solely on the validity of 41 C.F.R. § 60-1.4(e). As stated above, that regulation embodies a longstanding, congressionally approved policy in government procurement: anyone who wishes to do business with the government must assume the affirmative action obligations required by the executive order. This policy is so well known and well entrenched that anyone who does business with the government is held to that obligation.[11] NOPSI and MP&L of course have not disputed the pervasiveness of the requirement. We conclude that, even absent the disputed regulation, they have accepted the affirmative action obligations contained in E.O. 11246 by dealing with the government.[12]
 
 III.
 
 16
 Finally, we turn to the issue that prompted the Supreme Court to vacate and remand these cases for reconsideration in light of Marshall v. Barlow's, Inc., 1978, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305. In our first decision, we rejected the companies' contention that the executive order and its regulations violated the fourth amendment because they authorized warrantless searches of the companies' records. The holding relied heavily on two cases that have created what is now known as the Colonnade-Biswell exception to the warrant requirement. See Colonnade Catering Corp. v. United States, 1970, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 and United States v. Biswell, 1972, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87. Those two cases upheld statutorily authorized, warrantless searches of businesses in two heavily regulated industries, liquor and firearms. The Colonnade and Biswell decisions have been interpreted to mean that one who enters those businesses impliedly consents to warrantless inspections because such inspections are essential to the enforcement of the regulatory scheme. Almeida-Sanchez v. United States, 1973, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596. Extending that implied consent concept to our cases, we concluded that "where, as here, the Government validly regulates any business, the Government has a right to include in its regulations the requirement that certain records be kept open to official inspection so that the administrative agency can determine whether the company is complying". United States v. New Orleans Public Service, Inc., 553 F.2d at 472.
 
 
 17
 Marshall v. Barlow's, Inc. limited the reach of the Colonnade-Biswell exception. In so doing, it may have cast doubt on our use of the implied consent concept we derived from those cases. See generally, Note, Rationalizing Administrative Searches, 77 Mich.L.Rev. 1291, 1315-19 (1979). But that is a question we need not now reach, for Barlow's presents us with a firmer basis on which to uphold the inspection scheme erected by the regulations here.
 
 
 18
 At issue in Barlow's was the constitutionality of § 8(a) of the Occupational Safety and Health Act of 1970 (OSHA), 29 U.S.C. § 657(a), which authorized warrantless searches of the business premises of employers covered under the Act. The Secretary of Labor, who is charged with enforcing OSHA, argued under Colonnade and Biswell that the employer had impliedly consented to search, and that in any case, warrantless searches were reasonable under the fourth amendment because they were sufficiently restricted by agency regulation and were essential to effective enforcement of the Act. In rejecting both arguments, the Supreme Court stated that OSHA was unconstitutional "insofar as it purports to authorize inspections without a warrant or its equivalent ". 436 U.S. at 325, 98 S.Ct. at 1827, 56 L.Ed.2d at 319 (emphasis added). We take the italicized words to mean that a formal judicial warrant is not required in all administrative searches if the enforcement procedures contained in the relevant statutes and regulations provide, in both design and practice, safeguards roughly equivalent to those contained in traditional warrants. For instance, the Supreme Court in Barlow's pointed to several statutes that allow for resort to federal courts to enforce administrative searches against unwilling parties, by whatever order or remedy is appropriate. 436 U.S. at 321 nn. 18 & 19, 98 S.Ct. at 1825 nn. 18 & 19, 56 L.Ed.2d at 317 nn. 18 & 19. If the statutory or regulatory scheme provides for resort to the federal courts before an inspection is forced upon a party, then the inspection provisions will not themselves run afoul of the fourth amendment. The procedures at issue here, like the statutes cited in Barlow's, fulfill that requirement. 41 C.F.R. § 60-1.26.
 
 
 19
 After that initial determination, it is then the task of the district court to measure the specific search that is sought against the broad fourth amendment test of "reasonableness". Camara v. Municipal Court, 1967, 387 U.S. 523, 538-39, 87 S.Ct. 1717, 1735-36, 18 L.Ed.2d 930, 940-41. The proper elements of such an inquiry necessarily must vary with the nature and circumstances of the search that is desired, although Barlow's gives some general guidance to the district court. One element of the question is whether the proposed search is authorized by statute, and a second is whether it is properly limited in scope. 436 U.S. at 323, 98 S.Ct. at 1826, 56 L.Ed.2d at 318. A third element should be an examination of how the agency chose to initiate this particular search. The search will be reasonable if based either on (1) specific evidence of an existing violation, (2) "a showing that 'reasonable legislative or administrative standards for conducting an ... inspection are satisfied with respect to a particular (establishment)' ", 436 U.S. at 320-21, 98 S.Ct. at 1824, 56 L.Ed.2d at 316, (quoting Camara, 387 U.S. at 538, 87 S.Ct. at 1736, 18 L.Ed.2d at 940), or (3) a showing that the search is "pursuant to an administrative plan containing specific neutral criteria". 436 U.S. at 323, 98 S.Ct. at 1826, 56 L.Ed.2d at 318. It is important that "the decision to enter and inspect ... not be the product of the unreviewed discretion of the enforcement officer in the field". See v. Seattle, 1967, 387 U.S. 541, 545, 87 S.Ct. 1737, 1740, 18 L.Ed.2d 943, 947.
 
 
 20
 A district court may find other questions relevant to the reasonableness of the proposed search under the fourth amendment, but these three elements, at least, are essential. We find no indication in the record, however, that the district courts considered any of the three. Of course, the first two are questions of law that we may decide on appeal. Our first opinions in these cases have already concluded that E.O. 11246 and the regulations thereunder are statutorily authorized. New Orleans Public Service, 5 Cir. 1977, 553 F.2d 459; Mississippi Power & Light, 5 Cir. 1977, 553 F.2d 480. The inspections sought here are clearly within that statutory authority. Similarly, because the searches are restricted to an inspection solely of business records to test compliance with the affirmative action program, they are properly limited in scope. But the third inquiry is a factual question, and the record does not provide us with enough information to reach a decision ourselves. We must therefore remand to the district court for that determination.[13]
 
 
 21
 If the district court finds that the requested searches satisfy the fourth amendment standards of reasonableness outlined above, there will be no further objections that NOPSI and MP&L can raise, and the district court should immediately issue the injunctions requested by the United States. The government's efforts to conduct a compliance review of NOPSI date from 1969, and this action began in 1973. NOPSI's fides may be as bona as when we first relied on it in our June 1977 opinion, 553 F.2d at 474-75, but the time has come to bring this litigation to a conclusion, without further opportunity for delay.
 
 
 22
 The Court has considered all of the contentions the appellants have argued orally or by brief, including the contentions not discussed in this opinion.
 
 
 23
 We VACATE the orders entered by the district courts and REMAND these cases for further proceedings consistent with this opinion.
 
 
 
 [1]
 Section 202 of E.O. 11246, 3 C.F.R. 340 (1964-1965 Comp.), sets out a seven-point clause that must be included in most government contracts. Among other things, the clause provides: "The contractor will not discriminate against any employee or applicant for employment because of race, creed, color, or national origin. The contractor will take affirmative action to ensure that applicants are employed, that employees are treated during employment, without regard to their race, creed, color, or national origin." The history of E.O. 11246 is described in detail in United States v. New Orleans Public Service, Inc., 5 Cir. 1977, 553 F.2d 459. E.O. 11375, 3 C.F.R. 684 (1966-1970 Comp.), extended the requirements of E.O. 11246 to prohibit discrimination on the basis of sex. E.O. 12086, effective October 8, 1978, 3 C.S.R. 230 (1979), consolidated the entire contract compliance program in the Department of Labor
 
 
 [2]
 Aside from some specialized routes of appeal that are plainly not available here, see 15 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3901, at 397-98 (1976), the primary sources of appellate jurisdiction lie in 28 U.S.C. §§ 1291 and 1292. The only provision of § 1292 that might be applicable here is one providing for review of interlocutory orders granting or refusing injunctions. See 28 U.S.C. § 1292(a)(1). In Liberty Mutual Ins. Co. v. Wetzel, 1976, 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435, however, the Supreme Court held that an order denying an injunction is not appealable under § 1292(a)(1) by the party who, like the companies here, opposed the injunction
 
 
 [3]
 The orders issued by the district courts differed in one respect. The Court in No. 79-2636 also ordered that, within 90 days from the entry of the order, the government and MP & L were to seek through conciliation to resolve any remaining issues concerning the company's compliance with the executive order. Presumably, this additional provision was designed to fix a time limit after which the district court would enforce its decision by injunctive relief
 
 
 [4]
 The unusual procedural history of these cases also distinguishes them from Garza v. Smith, 5 Cir. 1971, 450 F.2d 790. In that case, this court dismissed, for lack of finality, an appeal from a three-judge district court that granted declaratory relief but withheld injunctive relief, choosing instead to retain jurisdiction in the event that injunctive relief would later be necessary. The present cases come to us in a different posture, however, because they represent, in essence, rehearings of cases that were undisputedly appealable when we first considered them. Before those first appeals, the district courts had decided all the issues presented and had granted injunctive relief, making their decisions appealable under § 1291. (It is our own first decision in these cases, which withheld injunctive relief, that prompted the district courts to fashion their present orders in the manner that they did.) This protracted and convoluted procedural history is what pushes the two orders here across the not always bright line distinguishing final orders from interlocutory ones
 
 
 [5]
 The district courts did not address this issue. They were of the opinion that since the Supreme Court vacated for reconsideration in light of Marshall v. Barlow's, Inc., and that since we remanded to them with those same directions, their review was limited to the effect Barlow's had on the prior decisions. Although we do go beyond the district courts' holdings and address questions other than those raised by the Barlow's decision, we go only so far as to explore the impact of Chrysler v. Brown. To the extent that the defendants have attempted to reopen issues unaffected by those two cases, we rest on our earlier decisions
 
 
 [6]
 40 U.S.C. §§ 471 et seq
 
 
 [7]
 Pub.L. No. 88-352, 78 Stat. 241 (codified in scattered sections of 42 U.S.C.)
 
 
 [8]
 Pub.L. No. 92-261, 86 Stat. 103 (amending the Civil Rights Act of 1964)
 
 
 [9]
 41 C.F.R. § 60-1.4(e) provides:
 Incorporation by operation of the Order. By operation of the Order, the equal opportunity clause shall be considered to be a part of every contract and subcontract required by the Order and the regulations in this part to include such a clause whether or not it is physically incorporated in such contracts and whether or not the contract between the agency and the contractor is written.
 
 
 [10]
 Section 4 requires that notice of proposed rules be published in the Federal Register no less than 30 days before their effective date, and that interested parties be given an opportunity to be heard before promulgation of the rule. The required notice for the rules here in dispute was published on February 15, 1968, well over 30 days before their promulgation on May 28, 1968. See 33 Fed.Reg. 3000, 7804 (1968). Although § 60-1.4(e) was not among the rules specifically set out in the notice of proposed rulemaking, the notice sufficiently identified the subject and issues involved so as to satisfy 5 U.S.C. § 553(b)(3). See generally K. Davis, Administrative Law Treatise § 6.25 (1978)
 
 
 [11]
 As the decision in Barlow's makes clear, implied consent to administrative searches is not easily found. This does not, however, affect our holding that the companies assumed the affirmative action obligation by dealing with the government. It is one thing to say that the companies' action in furnishing services to the government implies an acceptance of a policy of non-discrimination and affirmative action; it is entirely another to say that it also implies a willingness to give up fourth amendment rights
 
 
 [12]
 At oral argument we requested supplemental briefs on the inherent powers of the President as a source for E.O. 11246, an issue roundly debated by the commentators. See, e. g., Brody, Congress, The President, and Federal Equal Employment Policymaking: A Problem in Separation of Powers, 60 B.U.L.Rev. 239 (1980); Fleishman & Aufses, Law and Orders: The Problem of Presidential Legislation, 40 Law & Contemp. Prob. 1 (Summer, 1976); Note, Doing Good the Wrong Way: The Case for Delimiting Presidential Power Under Executive Order No. 11,246, 33 Vand.L.Rev. 921 (1980); Comment, The Philadelphia Plan: A Study in the Dynamics of Executive Power, 39 U.Chi.L.Rev. 723 (1972). Although our holding obviates the need to explore in detail the arguments advanced by counsel on this issue, we sketch them briefly here
 The issue centers on the extent of the power granted by two clauses of Article II of the Constitution: section 1, clause 1, which states that "executive power shall be vested in a President of the United States of America", and section 3, which states that the President "shall take care that the laws be faithfully executed". Most discussion on this point springs from the Supreme Court's decision in Youngstown Sheet and Tube Co. v. Sawyer, 1952, 343 U.S. 579, 585, 72 S.Ct. 863, 96 L.Ed. 1153, a case whose instructions cannot easily be gleaned since all six justices in the majority issued separate opinions. One line of argument follows Justice Black's view that policymaking is entirely Congress's province. Thus, to the extent that the executive order creates, rather than merely executes, fair employment policy, it is beyond the power of the executive. The construct more often referred to, however, is the one elaborated by Justice Jackson in his famous concurrence. 343 U.S. at 634-38, 72 S.Ct. at 888, 871. In his view, presidential authority can be arrayed in three categories, being strongest when he acts with the express or implied approval of Congress, weakest when he acts contrary to some express or implied will of Congress, and in a "zone of twilight" when Congress has expressed no will at all. We continue to hold the view, expressed in our first opinion, that E.O. 11246 is executive action that falls within the strongest category of presidential authority. See 553 F.2d at 467 n.8. But see Liberty Mutual Insurance Co. v. Friedman, 639 F.2d 164, 4 Cir. 1981.
 
 
 [13]
 For a survey of the types of criteria courts have evaluated to satisfy this inquiry, see generally Note, Camara, See, and Their Progeny: Another Look at Administrative Inspections Under The Fourth Amendment, 15 Colum.J. of L. & Soc.Prob. 61, 78-96 (1979)