**Lowell PETERSON, et al., Plaintiffs-Appellants,**

v.

**Kenneth E. LINDNER, Secretary of the Department of Administration, State of Wisconsin, Defendant-Appellee.**

**Nos. 84–1466, 84–1701.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 18, 1985.

Decided June 25, 1985.

Russell T. Golla, Anderson, Fisher, Shannon, O'Brien & Rice, Stevens Point, Wis., for plaintiffs-appellants.

Linda M. Clifford, LaFollette, Sinykin, Anderson & Munson, Madison, Wis., for defendant-appellee.

Before CUDAHY, Circuit Judge, FAIRCHILD, Senior Circuit Judge and GRANT, Senior District Judge.*

CUDAHY, Circuit Judge.

In this class action, a group of Wisconsin circuit court reporters brought suit for declaratory and injunctive relief and damages, claiming that salary classifications under which they were paid violated the equal protection clause of the fourteenth amendment, and gave rise to a cause of action under 42 U.S.C. § 1983. Although the district judge originally assigned to the case ruled there was a constitutional violation, a second judge later reconsidered that ruling and then dismissed the reporters' claims. We affirm the dismissal.

I.

This case was originally filed in the Western District of Wisconsin, but due to a particularly burdensome workload there, it was informally transferred to the Eastern District and assigned to Judge Myron Gordon. After certification of the suit as a class action, the parties agreed to submit the case to the court for resolution of the liability issue, on the basis of stipulated facts and documents. Judge Gordon found the relevant facts as follows:

> Prior to August 1, 1978, Wisconsin's state trial courts were divided into two categories: circuit courts and county courts. Court reporters in the circuit courts were paid by the state. One-half of the base salary of county court reporters was paid by the state; the other half was paid by the county in which the court was located.
>
> In addition to the base salary paid to reporters by the state and/or the counties, each county was permitted to pay its circuit and county court reporters an additional payment known as a county supplement, if it so desired. Some counties paid large supplements; other counties paid smaller supplements or none at all.
>
> On August 1, 1978, state legislation creating a single level trial court system in Wisconsin went into effect. All county courts became circuit courts, and the circuit courts all had the same functions and responsibilities. Judges who had previously been county court judges became circuit court judges, and all judges'

---

* The Honorable Robert A. Grant, Senior District Judge of the Northern District of Indiana, sitting by designation.

salaries were equalized. Former county court reporters became circuit court reporters, but their salaries were not equalized.

As part of the new legislation, § 20.-923(7m), Wis.Stats., provided that the salaries of all circuit court reporters and former county court reporters who became circuit court reporters on August 1, 1978, continue at the same rate earned before that date. These reporters are eligible for annual pay increases pursuant to § 20.923(7), Wis.Stats. The increases are based on a percentage of the reporter's salary, but such percentage is computed without regard to the portion of salary previously received as a county supplement.

For court reporters hired after August 1, 1978, the salary range is established in § 20.923(7), Wis.Stats. This salary range is not tied to the former county supplement pay system.

The impact of §§ 20.923(7) and 20.-923(7m) for the plaintiffs is that all court reporters are now circuit court reporters with the same functions and responsibilities, but they are not paid the same. A reporter falls into a different salary classification depending on the amount, if any, of county supplement he or she received prior to August 1, 1978. The highest county supplement paid at that time was $434.00 per month; the lowest supplement was zero.

. . . .

. . . .

In support of their position, the plaintiffs point to the conclusions of the court reporter qualification and compensation committee. The latter committee was formed pursuant to the legislative mandate of § 753.18(3), Wis.Stats., and it included a member of the defendant's staff. Its final recommendation of February, 1980, and two letters or reports by its chairperson summarizing and explaining the recommendations, have been entered into the record by stipulation. In short, the committee concluded that broad salary differentials generated by county supplements are irrationally based on the date, county, and status of appointment rather than on job proficiency.

*Peterson v. Hanson,* 565 F.Supp. 87, 88–89 (E.D.Wis.1983).

Based on these facts, Judge Gordon concluded that there was no rational reason for continuing, under the new single-level trial court system, the disparate salary classifications that were based primarily on the previous receipt of county supplements. He thus decided that the statutes incorporating those disparities were unconstitutional. Holding that injunctive relief was appropriate, Judge Gordon required the defendant in the future to pay each member of the class the difference between the highest county supplement incorporated into the salary structure and the portion of the reporter's salary representing the county supplement, if any, he or she had previously received, and also ordered that annual salary increases and fringe benefits be adjusted accordingly. *Id.* at 89. Judge Gordon reserved ruling on questions concerning compensatory damages, interest and attorneys' fees.

On June 6, 1983, the defendant moved for reconsideration of the injunction granting prospective relief, on the basis that the relevant statutes had been repealed, and that a new pay plan had been implemented on June 1, 1982, that would eliminate the county supplement-based salary disparities. The reporters submitted facts disputing this claim. On July 6, 1983, the defendant appealed to this court the order granting the injunction. On August 18, Judge Gordon indicated in a memorandum of certification his intention to grant the defense motion for reconsideration of the injunction if the appeal was remanded. Judge Gordon noted that the stipulations submitted by the parties, on which his previous decisions about liability and injunctive relief were based, had made no mention of the repeal of the statutes and new pay plan, and that there was considerable dispute concerning the effect of the injunction on salaries under that new plan. Therefore,

without altering his prior holding that the statutes were unconstitutional, Judge Gordon certified his intention to reconsider the injunctive portion of his previous order. *Peterson v. Hanson,* 569 F.Supp. 694, 695–96 (W.D.Wis.1983).

The defendant subsequently moved to dismiss the appeal, the case was remanded, and on October 24, 1983, Judge Gordon vacated the injunction. Since by this time the work demands in the Western District had eased, he then returned the case to the Western District where a new judge was assigned to the case to handle unresolved matters. These matters included the fashioning of appropriate relief after consideration of the effect of the new pay plan.

The case was first assigned to Judge Shabaz. The defendant then moved for reconsideration of the portion of Judge Gordon's original order declaring the statutes unconstitutional. In response, the reporters moved to strike the motion to reconsider on the ground that Judge Gordon's order was final and could not be reconsidered and also successfully moved that Judge Shabaz be disqualified.

Finally, the case was reassigned to Judge Crabb. On February 29, 1984, Judge Crabb entered an order in which she reversed Judge Gordon's decision declaring the statutes unconstitutional, and dismissed the case. *Peterson v. Lindner,* No. 81–C–994–C (W.D.Wis. Feb. 28, 1984). It is from this order that the reporters now appeal.

## II.

■ Before reaching the issue whether the Wisconsin statutes were unconstitutional, we consider the reporters' argument that it was improper for Judge Crabb to reconsider and reverse Judge Gordon's original order, which had declared the statutes unconstitutional. The reporters contend that Judge Gordon's order was final, under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and for purposes of appeal, under 28 U.S.C. § 1291. Since the defendant did not appeal that portion of the order declaring the statutes unconstitution-

al within the applicable time limit, the reporters contend, it became final and binding, was not subject to reconsideration by Judge Crabb, and so must be reinstated.

Although questions about the finality of judgments are frequently thorny, the general rule is that a decision is final for purposes of appeal if it " 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.' " *Freeman v. Kohl & Vick Machine Works, Inc.,* 673 F.2d 196, 198 (7th Cir.1982) (quoting *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945)). Thus where "a judgment is rendered with respect to only part of the relief sought by plaintiffs and where consideration of further relief is specifically reserved, the judgment is not final." *Harris v. Goldblatt Brothers, Inc.,* 659 F.2d 784, 786 (7th Cir.1981). Since at the time Judge Gordon ruled the statutes unconstitutional and entered an injunction, he expressly left open for future resolution such issues as the availability of damages, the order was presumably not final and appealable.

■ The reporters argue, however, that this case presents an exception to the general rule, because Judge Gordon's order granted declaratory relief. They base this argument on the words of the Declaratory Judgment Act, which provides in part:

In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, *whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.*

28 U.S.C. § 2201 (emphasis added). The reporters contend that the emphasized language means that declaratory judgments are intended to be different from other sorts of judgments. They say that an order declaring the parties' rights becomes

final and immediately appealable, even if issues relating to "further relief" have yet to be determined in the case. Unfortunately, the plaintiffs have not cited us to any authority for their position, and there is a dearth of discussion of it anywhere.

Clearly, declaratory judgments are intended to be as 'final' as any other judgments; the issue is whether they are intended to be more so, or whether the usual guidelines for determining finality apply. In this regard, it seems apparent that the primary purpose of the language of section 2201 was to ensure that the declaratory judgment would not be viewed, as it sometimes had been, as an extraordinary remedy, available only when coercive forms of relief were inappropriate. The provision that rights can be declared "whether or not further relief is or could be sought" means that a party may seek and be granted a declaratory judgment regardless whether for various reasons it chooses not to pursue a coercive remedy, or does pursue coercive relief, either as an alternative to, or in addition to, the declaration of rights. *See generally* E. BORCHARD, DECLARATORY JUDGMENTS, chs. VI and X (2d ed. 1941). *Cf. Steffel v. Thompson*, 415 U.S. 452, 466–68, 94 S.Ct. 1209, 1219–20, 39 L.Ed.2d 505 (1973) (citing *Perez v. Ledesma*, 401 U.S. 82, 111–115, 91 S.Ct. 674, 690–92, 27 L.Ed.2d 701 (1971) (Brennan, J., dissenting) (declaratory relief primarily designed to provide milder alternative to injunction)). To the same effect is FEDERAL RULE OF CIVIL PROCEDURE 57, which provides that "[t]he existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate." The Advisory Committee Note to Rule 57 explains that "[t]he fact that a declaratory judgment may be granted 'whether or not further relief is or could be prayed' indicates that declaratory relief is alternative or cumulative and not exclusive or extraordinary." *See also* 10A C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2758 (2d ed. 1983).

Thus, the "further relief" language, in combination with the sentence giving a declaratory judgment "the force and effect of a final judgment," makes it clear that declaratory judgments should be given an effect as to finality equivalent to that of other judgments. This conclusion is consistent with the cases cited by the plaintiffs, which stand for no more than the unremarkable proposition that when a declaratory judgment otherwise meets the requirements for finality, it will be considered final even though the relief granted is "merely" declaratory rather than coercive. *See, e.g., United States v. Mississippi Power and Light Co.*, 638 F.2d 899 (5th Cir.1981), *cert. denied*, 454 U.S. 892, 102 S.Ct. 387, 70 L.Ed.2d 206 (1982); *Mattis v. Schnarr*, 502 F.2d 588 (8th Cir.1974), *reversal after remand vacated on other grounds*, 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977).

We have found no support, however, for plaintiffs' proposition that section 2201 was intended to make declaratory judgments somehow more final, or final at an earlier stage, than other sorts of judgments. To the contrary, the case law undermines the proposition that any declaration of rights made in a case becomes a final declaratory judgment suitable for immediate appeal. For example, in *Liberty Mutual Insurance Co. v. Wetzel*, 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1975), the Supreme Court *sua sponte* raised the issue whether the Court of Appeals had had jurisdiction to entertain the appeal. The Court decided there had been no such jurisdiction, since the order from which an appeal was taken, which stated that petitioner's pregnancy-related policies violated Title VII, was not a final, appealable order. Significantly, the Court stated: "[E]ven if we accept respondents' contention that the District Court's order was a declaratory judgment on the issue of liability, it nonetheless left unresolved respondents' requests for an injunction, for compensatory and exemplary damages, and for attorneys' fees. It finally disposed of none of respondents' prayers for relief." *Id.* at 742, 96 S.Ct. at 1205. Finding that the order was merely a grant of partial summary judgment on liability, which orders are "by their terms interlocu-

tory," *id.* at 744, 96 S.Ct. at 1206, (citing FED.R.CIV.P. 56(c)), and concluding that no alternative basis for appealability existed, the court vacated the judgment of the Court of Appeals and remanded with instructions to dismiss the appeal. *See also Southern Parkway Corp. v. Lakewood Park Co.*, 273 F.2d 107 (D.C.Cir.1959) (concluding that the finality language of § 2201 means only that "with regard to finality and review, declaratory judgments are like other judgments," and so dismissing an appeal from a declaratory judgment not in conformity with FED.R.CIV.P. 54(b)).

It is only sensible, in terms of orderly judicial administration, that declaratory judgments should be treated like other judgments for purposes of determining finality, since the alternative interpretation offered by plaintiffs would force a party, if it were to preserve its right to appeal, to immediately appeal any statement resembling a declaration of rights. Such a procedure would foster the piecemeal appeals that the finality requirement is designed in part to prevent. *See Gillespie v. U.S. Steel Corp.*, 379 U.S. 148, 152–53, 85 S.Ct. 308, 310–11, 13 L.Ed.2d 199 (1964).

■ The original order entered by Judge Gordon was not a final declaratory judgment. As in *Liberty Mutual*, Judge Gordon's order left open significant issues relating to damages and other relief. Also, as Judge Crabb pointed out, Judge Gordon did not enter a formal judgment on the order. Indeed, even Judge Gordon, in indicating his willingness to grant the defendant's motion for reconsideration of the injunctive portion of the order after it was disclosed that the statutes at issue had been repealed, stated:

> I do not believe the motion for reconsideration can properly be characterized as a motion under Rule 60(b), Federal Rules of Civil Procedure. That rule applies only to *final* judgments and orders; no final judgment or order has yet been made in this case. Rather, the motion must be considered to be directed to the court's inherent power to modify or re-

scind interlocutory orders prior to final judgment.

*Peterson v. Hanson*, 569 F.Supp. at 695 (citations omitted). The intention of the judge rendering the decision at issue is a factor in determining finality. *See United States v. Hunt*, 513 F.2d 129, 136 (10th Cir.1975). For these reasons, we believe Judge Crabb was correct in concluding that the original order declaring the statutes unconstitutional was interlocutory.

■ Of course, if the order was interlocutory, Judge Crabb had the power to reconsider it at any time before final judgment. *E.g., Diaz v. Indian Head, Inc.*, 686 F.2d 558, 562 (7th Cir.1982). Moreover, while a district judge should carefully consider the propriety of re-examining a prior ruling of another district judge in the same case, when good reasons for doing so appear (such as new evidence or controlling law, or clear error), the "law of the case" doctrine must yield to rational decisionmaking. *See* Annot., 20 A.L.R. FED. 13 (1974). Here, new evidence regarding the repeal of the statutes came to light after Judge Gordon made his original decision; though he chose not to reconsider the declaratory portion of his original order before transferring the case, he clearly had the *power* to do so, and therefore so did Judge Crabb. "[A] trial judge should not court reversal because of the erroneous ruling of another judge any more than because of an erroneous ruling of his own." 1B J. MOORE, J. LUCAS & J. CURRIER, MOORE'S FEDERAL PRACTICE ¶ 0.404[4.–2] at 127 (2d ed. 1984). In any event, whatever factors properly should govern the reconsideration by a second judge of the interlocutory ruling of a first judge, we think the issue is somewhat different on appeal. "[O]bviously we cannot be expected to reverse a correct decision by one district judge simply because we find it is contrary to a prior ruling by another district judge in the same case, i.e. contrary to the 'law of the case.'" *Champaign-Urbana News Agency, Inc. v. J.L. Cummins News Co.*, 632 F.2d 680, 683 (7th Cir.1980) (quoting *Parmelee Transportation Co. v. Keeshin*, 292 F.2d 794, 797 (7th Cir.), *cert. denied*, 368 U.S. 944, 82 S.Ct.

376, 7 L.Ed.2d 340 (1961)). Thus our task is simply to determine whether or not Judge Crabb's decision that the statutes were constitutional was correct.

## III.

 The parties correctly note that the challenged statutes are subject to review under the "rational relationship" standard, which generally means that a legislative classification should be upheld if it " 'bears some fair relationship to a legitimate public purpose.' " *Sklar v. Byrne,* 727 F.2d 633, 636 (7th Cir.1984) (quoting *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982)). Legislation in question is presumed to be rational, and the party challenging it bears the "heavy burden" of demonstrating that " 'the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [a court] can only conclude that the legislature's actions were irrational.' " *Hodel v. Indiana,* 452 U.S. 314, 322, 101 S.Ct. 2376, 2382, 69 L.Ed.2d 40 (1980) (quoting *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979)).

Plaintiffs note that the historical disparities among similarly-situated court reporters' salaries were primarily based on arbitrary status and geographical distinctions that arose from the previous two-tiered system of circuit and county courts. When the Wisconsin legislature created a single, unified court system, the reporters argue, any justification for those distinctions disappeared. Yet, instead of equalizing the reporters' salaries, as it had done with judges, the legislature enacted the challenged statutes, which merely froze existing salaries and so locked in the irrationally-based disparities. Plaintiffs cite the report of the committee on reporter qualifications, which two years after enactment of the challenged statutes concluded that the "broad, inequitable and irrational salary disparities" were "irrationally based on the date, county and status of appointment ... rather than on job proficiency"

and so were "inconsistent with a unified court system and a compensation system based on proficiency and equity." Court Reporter Qualifications and Compensation Committee, *Final Recommendations* 9, 11 (Feb. 1980), reprinted in Pl.App. at 44, 46.

Defendant does not contend that the salary disparities are based on any legitimate merit factor, but rather urges that the challenged statutes incorporating them must be viewed in light of the complexity of the reorganization and the legislature's subsequent efforts to remedy the inequities created by the salary differentials. It notes that at the same time the Wisconsin legislature froze the reporters' salaries in sections 20.923(7) and (7m), it also in section 753.18(3) created the Court Reporter Qualifications and Compensation Committee and mandated development of a program establishing qualifications and compensation levels for court reporters based on job proficiency—without regard to previous salary ranges. Two years later, that Committee issued its final recommendations on those issues. Finally, in 1982, the legislature repealed sections 20.923(7) and (7m), in light of the state courts' adoption of the new court reporter pay plan that same year. Thus, the defendant characterizes the challenged statutes as merely the first step in a rational, incremental approach to solving a complex problem.

Noting that the defendant's argument was "being offered for the first time as an after-the-fact rationalization of four years of statutorily-mandated disparate treatment of similarly situated state court reporters," Judge Crabb expressed her doubt that the legislature's actions over the period between enactment of the statutes in 1978 and their repeal in 1982 were realistically part of a deliberate three-step, four-year effort to institute an equitable pay schedule. She found it "more than coincidental" that the legislature waited four years, but then adopted a new pay plan approximately six months after plaintiffs filed suit in this case. Nevertheless, although Judge Crabb could not find the defendant's rationalizations compelling, she

concluded that they were not irrational either, and concluded that plaintiffs had not met their burden of establishing an equal protection violation. *Peterson v. Lindner,* No. 81–C–994–C (W.D.Wis. Feb. 28, 1984).

### IV.

The defendant stresses the difficulties inherent in the conversion from a dual to a unified court system, noting that the legislature had to balance several competing interests in resolving the reporter salary issue. Viewed as of the time of the court reorganization in 1978, the legislature had four choices: it could have increased all reporters' salaries by the amount necessary to match the highest county supplement; it could have eliminated any portion of salary that was based on a previously-received county supplement; it could have implemented a new state-wide pay plan that would eliminate the disparities in an efficient and equitable manner; or it could have "temporarily" frozen salaries pending creation of such a new plan. Arguably, the first alternative was prohibitively expensive and would only increase the reporters' base pay without regard to qualifications. Eliminating all supplements, on the other hand, would have required many court reporters to take a cut from their existing salaries and might have resulted in the loss of some reporters, at least some of whom were presumably qualified and experienced. While the third alternative, immediate implementation of a comprehensive plan, would have been ideal, the defendants argue that the impending deadline for completion of the court reorganization made this approach impractical. Only the fourth

alternative provided a rational method for harmonizing the legitimate goals of "fair compensation of state employees, the retention of experienced personnel, the prompt implementation of court reorganization, and fiscal responsibility." Def.Br. at 13.

We have no doubt that these would have been legitimate alternatives and considerations for the legislature to weigh in fashioning a new qualifications and compensation program for court reporters under the unified system. More questionable, however, is whether sections 20.923(7) and (7m) were rationally related to a desirable program, or, put somewhat differently, whether subsequent events adequately demonstrate that the challenged legislation represented a rational first step toward a new pay scale, rather than the entrenchment of an old and inequitable one.

Clearly, a legislature is entitled to act on only part of a problem, and may elect to promptly address various issues or to implement a desirable solution in a gradual, step by step fashion. *See City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976); *McDonald v. Board of Election Commissioners,* 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969); *Sklar v. Byrne,* 727 F.2d 633 (7th Cir.1984). We believe that, to justify delay, some evidence of deliberate design or ongoing concern by the legislature must be apparent; otherwise virtually any legislative action, no matter how incomplete or ineffective, would be sustainable as a "partial step" toward a new system.[1] Here, however, we

---

**1.** *Cf. Clements v. Fashing,* 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1981), in which the plurality, concurring and dissenting opinions each commented on the deference to be given legislative schemes that are characterized as proceeding "one step at a time." Justice Stevens' concurring opinion noted that such an assertion, while often appropriate, "is simply another way of stating that there need be no justification at all for treating two classes differently during the interval between the first step and the second step—an interval that, of course, may well last forever." *Id.* at 976, 102 S.Ct. at 2850. Justice Brennan, in dissent, stressed that a "step by

step" justification for an underinclusive regulation is only valid where "the record demonstrates that such 'one step at a time regulation' is in fact being undertaken" rather than merely applied as a label for arbitrary or haphazard "steps." *See id.* at 981, 102 S.Ct. at 2853. It seems appropriate to note also that the degree to which the step by step rationale is a believable (and appropriate) justification for the differential treatment of classes not covered by the "first step" regulation should depend in part on the nature and severity of the classification. *See, e.g., id.* at 976, 102 S.Ct. at 2850, where Justice Stevens notes that while a step by step

believe evidence of ongoing purpose is presented by the legislature's mandate, in section 753.18(3), that a new comprehensive system of qualifications and compensation be developed. The simultaneous creation of the machinery necessary to produce a more rational and comprehensive system along with the implementation of steps minimizing the impact of the existing arrangement lends credence to defendant's claim that sections 20.923(7) and (7m) were intended to be temporary measures only.

Of course, if a legislature were to take no action to rectify significant inequities created by its partial or temporary approach to a given problem, a "step by step" justification would progressively lose force. This was much the situation in the case urged by plaintiffs to be dispositive of the outcome here, *Weissman v. Evans*, 56 N.Y.2d 458, 452 N.Y.S.2d 864, 438 N.E.2d 397 (1982). That case concerned very similar facts, although state district judges, rather than court reporters, were involved. Following the state's takeover of the courts, the New York legislature passed a unified court budget act in 1977, which placed all judicial personnel, who formerly had been compensated in part by localities, on the state payroll. Although the goal of the statute clearly was to centralize funding and eliminate problems created by "artificial local boundaries," the act included an open-ended provision that salaries of district judges would continue in effect until altered by state law. *Id.*, 452 N.Y.S.2d at 865, 438 N.E.2d at 398. Despite a report in 1979 that recommended equalization of the judges' salaries, when the legislature "finally did get around to establishing its own salary scales for its newly absorbed District Court Judges, *it still chose to maintain rather than to eliminate the disparity.*" *Id.*, 452 N.Y.S.2d at 866, 438 N.E.2d at 399 (footnote omitted) (emphasis added). More than three years later, when the suit was brought, the legislature still had taken no action to equalize the salaries (*nor, apparently, did it intend to do so* [2]). Under these circumstances, the court said it had no choice but to declare the state's actions unconstitutional.[3]

Thus, if in the case before us the legislature had done nothing after receiving the recommendations of the Committee on Court Reporter Qualifications and Compensation (much less if it had acted affirmatively to continue the salary disparities) we might question its intentions. We might well agree with the plaintiffs that the origi-

---

approach is "unobjectionable in a case involving the differences between different public offices," a separate standard than that proposed by the plurality would be necessary to evaluate state legislation that "treats different classes of persons differently." Thus, if in this case the legislature had simply decided to pay half of the court reporters an increased salary, an explanation that it was thereby taking the first step toward its goal of increasing all salaries would hardly be persuasive. But because the salary disparities were based on real historic differences between two systems, a temporary "step" that reduces the disparity somewhat, pending adoption of a more comprehensive solution, assumes a more rational character, at least for the reasonable time necessary to implement the next "step."

**2.** With respect to the legislature's suggested intent, it is interesting to note that the defendant in *Weissman* apparently did not argue that either the original statute freezing salaries or the subsequent adoption of a salary scale was intended to be a temporary measure pending implementation of a more equitable program. Rather, the state, "lacking adequate explanation for the long delay in eliminating the disparity [merely argued] that the territorial distinction, coupled with the history of the inequality practiced by the respective counties in years gone by, interdicts an equal protection claim." *Weissman v. Evans*, 452 N.Y.S.2d at 866, 438 N.E.2d at 399.

**3.** Clearly, the court found the legislature's failure to equalize salaries when it had the opportunity to do so as persuasive a factor as the long delay. In deciding the appropriate date from which to measure the state's obligation to eliminate the salary differential, the court commented:

But puzzling is the legislative failure to have acted on this subject when, in 1979, it finally focused on the salaries of the District Court judges. It appears to us that, since the Legislature then found the time to fix salaries, ... it surely was presented with the occasion to see to it that, in the process, the parity required by the Constitution was achieved.

*Weissman v. Evans*, 452 N.Y.S.2d at 868, 438 N.E.2d at 401.

nal statutory provisions freezing the salary differentials into the new scheme could not be seen as part of a rational attempt to harmonize competing concerns. But instead, two years after the Committee's report was complete, the legislature repealed the statutes, and replaced them with a new, comprehensive plan. Plaintiffs imply that factors such as the two-year delay following the report, as well as the timing of the new plan (adopted close on the heels of this lawsuit) reduce the credibility of the state's contention that this was part of a deliberate four year program. And so they do. This does not mean, however, that the state's contention is irrational. The problem addressed here did not solely involve the fiscal and fairness concerns implicated by equalization of widely discrepant salaries. It also included the complex issue of how to tie compensation and advancement to proficiency for all reporters, including those who had been paid under the dual system, a complication that we suppose was absent in the equalization of judges' salaries undertaken in *Weissman*.

Thus, although the legislature presumably could have acted more quickly (at least after receiving the committee's recommendations), the proper standard is not whether the legislature acted admirably but whether it acted rationally. And, although we have the same doubts as did Judge Crabb about whether sections 20.-923(7) and (7m) when enacted were really intended to form the beginning of a three-part, four-year plan, the legislature's subsequent actions are sufficient—if just barely—to convince us that the statutes were rationally related to the state's legitimate goals. See *Sklar v. Byrne*, 727 F.2d 633 (7th Cir.1984), in which this court, discussing an ordinance that allowed owners of handguns on a certain date to keep them but prohibited others' possession of handguns, approved of the ordinance as a "first step in a gradual approach to the problems of handgun violence," *id.* at 641 n. 12.

Finally, plaintiffs argue that Judge Crabb failed to consider the fact that the new pay plan effective June 1982 does not completely eliminate the salary disparities. There is some dispute about the effect of the new pay plan. Mr. J. Dennis Moran, Director of State Courts, who implemented the new plan, submitted an affidavit summarizing its effects. Of the 211 reporters placed in the new compensation schedule, he stated, salary disparities were "being eliminated" for 51. (All of these 51 reporters received more compensation than the salary schedule indicated, primarily as a result of the prior county supplements). Further, Mr. Moran stated that the remaining 160 reporters "are now compensated solely on the basis of certification, experience and job performance," including 42 reporters who previously received county supplements, the effects of which "have been eradicated" under the new plan. Plaintiffs, however, submitted an affidavit by one of the named plaintiffs in the case, Wesley Gales. Mr. Gales disputed the number of reporters for whom salary disparities had been completely eliminated, putting the figure closer to 12 than to 42. Based on these materials, plaintiffs argue that the new pay plan does not eliminate disparities for all reporters and that it may take years before the effects of the old system are completely eradicated for all reporters, if they ever are.

█ It is, for several reasons, unnecessary to analyze the precise effects of the new plan. First, plaintiffs do not challenge the new plan *per se* as being violative of equal protection; rather, they brought suit to challenge statutes that did far less than the new plan to eliminate the salary disparities and that have now been repealed. The new plan is only relevant to the extent it affects the perceived rationality of the earlier statutes by making the state's claim that those statutes were part of a long-term effort more credible.[4] Second, even if

---

4. Of course, the apparent effectiveness of the new plan is a factor to be considered, since we presume that a new plan that included only nominal or illusory changes could not be said to make the earlier statutes appear more rational.

The inference would then presumably be that the legislature was merely delaying the problem. But we are convinced that is not the case here.

we accept plaintiffs' contentions that the new plan does not yet completely eliminate the disparities for many reporters, and may not do so at all for some reporters, we believe the new plan (and, more precisely, the repealed statutes) nevertheless constitutes part of a rational program for achieving the legislature's legitimate goals.

The plaintiffs' arguments essentially assume that the only rational alternative would be for the new plan to eliminate completely any salary disparities that might be traceable to past receipt of county supplements, which in turn assumes that salary equalization is the state's only legitimate goal. To the contrary, however, the state appropriately can take into account fiscal constraints that may make a gradual transition far more feasible than would be an immediate equalization of all reporters' salaries at levels incorporating the highest county supplement. Such an increase does not seem to represent the most sensible, much less the only legitimate, method of reaching the legislature's apparent goal of minimizing the effect of the arbitrary county supplements while emphasizing proficiency and other merit factors in determining salary levels. While fiscal concerns alone would not justify an arbitrary distinction among similarly situated employees, here the legislature's method of eliminating the effects of historically arbitrary pay differences clearly has a rational basis. "Particularly in matters concerning the State's budget, equal protection does not require that all classifications be made with mathematical precision," *Tolub v. Evans*, 58 N.Y.2d 1, 457 N.Y.S.2d 751, 444 N.E.2d 1 (1982), *appeal dismissed*, 460 U.S. 1076, 103 S.Ct. 1760, 76 L.Ed.2d 337 (1983), nor does it require immediate, identical treatment of persons who are not identically situated, under the circumstances presented here.

Indeed, our conclusion is supported by the New York Supreme Court's reasoning in *Tolub*, which was decided only a short time after the *Weissman* case previously discussed. *Tolub* concerned the method of computing salaries of persons who served as law assistants to Justices and Judges in the New York unified court system. The petitioners had been paid by the city under the previous dual court system, but became state employees after the unification. The new classification plan operated so that some petitioners received less salary than some previously state-paid employees with the same number of years of service, and received a smaller annual increase as a result. As in the case before us, however, no employee suffered any loss of salary as the result of the new plan. The court in *Tolub* distinguished *Weissman*, noting that in *Weissman* "tradition" was the only reason offered to justify continuation of the wage disparity. In *Tolub*, on the other hand, the legislature made allocations in a "fairly impartial and expedient manner" during the transition period from the dual to the unified system, *Tolub v. Evans*, 457 N.Y.S.2d at 755, 444 N.E.2d at 5, and so the residual wage disparities were not unconstitutional. We note that the Supreme Court implicitly approved this result when it summarily dismissed the appeal from the *Tolub* decision, 460 U.S. 1076, 103 S.Ct. 1760, 76 L.Ed.2d 337.

In sum, we must consider the complexity of the transition from a dual to a unified court system, as well as the state's legitimate interests in fair compensation based primarily on proficiency and merit factors, prompt and orderly implementation of the new system and fiscal responsibility. On the basis of those factors, we cannot say that the challenged statutes, freezing salaries pending completion of the qualification and salary study, were irrational. Particularly in light of the subsequent repeal of the statutes and adoption of a new, more equitable pay plan, we conclude the legislature's actions here were constitutional. Accordingly, the district court's order is AFFIRMED.